WILL OF WALKER: COE, Proponent, Appellant (WISCONSIN
   METHODIST HOSPITAL AND HOME ASSOCIATION, Re-
   siduary legatee), vs. WALKER and others, Respondents.

*April 7—June 20, 1927.*

*Wills: Undue influence: Evidence: Sufficiency.*

Evidence that a testator, shortly before his death, revoked his
   will in favor of relatives and executed a new one leaving all
   his property to a hospital association, and that he was at-
   tended during his last illness by the executive secretary of
   the association, a clergyman, who under pretense of admin-
   istering to the spiritual welfare of the testator alienated him
   from his relatives and persuaded him to execute the will in
   favor of the hospital, is *held* to justify a finding of the county
   court that the will was executed by reason of undue influence.

APPEAL from a judgment of the county court of Douglas
county: WILLIAM E. HAILY, Judge. *Affirmed.*

The will of Francis C. Walker, deceased, was offered for
probate in the county court of Douglas county by the *Wis-
consin Methodist Hospital and Home Association* (herein-
after referred to as the *Hospital Association*), the residuary
and principal legatee. The probate of the will was objected
to by the brothers and sisters of the deceased. The county
court denied probate of the will, on the ground that it was
procured by undue influence, and the executor named in the
will brings this appeal.

For the appellant *Coe* and the *Wisconsin Methodist Hos-
pital and Home Association,* residuary legatee, there was a
brief by *Coe Brothers* of Barron, attorneys for appellant,
and *Frank R. Bentley* of Madison, attorney for the residuary
legatee, and oral argument by *Mr. Bentley.*

For the respondents there was a brief by *Donovan &
Gleiss* of Tomah, attorneys, and *Grady, Farnsworth &
Walker* of Portage, of counsel, and oral argument by *Daniel
H. Grady* and *T. P. Donovan.*

The following opinion was filed May 3, 1927:

OWEN, J.   At the time of his death on March 7, 1924, the testator was sixty-three years of age.   He had acquired an estate valued in excess of $40,000.   He was a farmer, and owned considerable lands in Barron and Douglas counties.   For a number of years he had lived near Chetek, in Barron county.   During the latter years of his life he lived in Gordon, in Douglas county.   He was thrifty and prosperous and a close business man.

During the year 1922 it was apparent not only to himself but to his friends and neighbors that he was in failing health. During that year and the year 1923 he aged rapidly in appearance.   In February of 1923 he made his will, in which he left all of his property to his relatives, principally his brothers and sisters.

In July of 1923 he made a visit to Sparta, where a number of his brothers and sisters resided.   He spent July 4th with them.   A day or two after July 4th he went to the Mayo clinic at Rochester in the hope that he might discover the nature of his ailment.   It was there determined that he was suffering from pernicious anæmia.   He returned to his home at Gordon and declined rapidly, both physically and mentally. From that time until the 1st day of November, 1923, he lived on his farm at Gordon.   He was alone, except for the presence of certain hired help.

On November 1, 1923, he went to Chetek and procured a room in a hotel, where he stayed for about three weeks. During that time he was confined to his bed, or at least to his room, and was cared for by the proprietor of the hotel and his wife.   Thereafter he secured living accommodations in the residence of Guy Williams, in the village of Chetek. He remained there about one week, during which time he was confined to his bed and during which time he was cared for by Mr. and Mrs. Williams.   In the latter days of November

he was taken to the home of one of his sisters in Sparta, where he remained until December 30th, when he was removed to the hospital at Sparta. While in the hospital at Sparta, on January 7, 1924, he executed a will, leaving the bulk of his property to the *Hospital Association*. Within a few days thereafter he was caused to be removed from the hospital at Sparta by the Reverend J. W. Irish, executive secretary of the *Wisconsin Methodist Hospital and Home Association,* to the Methodist Hospital at Rice Lake, where he died on the 7th of March, 1924.

It will be noted that in February, 1923, the testator made his will in favor of his relatives. It will further be noted that on the 7th day of January, 1924, he made another will, by the terms of which practically all of his property was left to the *Hospital Association.*

The county court found that the second will was executed by reason of undue influence exerted upon the testator by the Reverend J. W. Irish, executive secretary of the *Hospital Association.* This appeal challenges the correctness of that finding.

An examination of the record convinces us that this finding is well supported by the evidence, and that the judgment of the county court must be affirmed. In stating our reasons therefor we shall not review the evidence in detail. As usual in such cases the evidence is voluminous, and is addressed to the physical and mental health of the testator for a period of two or three years prior to his death. We will simply state in the most general way the conclusions which this evidence, when brought together, weighed and considered, tends to support.

It is undisputed that the death of the testator was due to the disease known as pernicious anæmia. It is impossible to tell when the disease originated, but it is probable that he was suffering from it to some extent for a period of at least two years prior to his death. Distinguished medical experts also testified, such testimony being based upon hypothetical ques-

tions, that in their opinion the pernicious anæmia was accompanied by senile dementia.   It was admitted by practically all medical experts who testified, that in a certain percentage of cases pernicious anæmia is accompanied by mental disturbance, and that mental symptoms are often the first manifestations of pernicious anæmia.   Neighbors and associates of testator testified to many irrational acts and manifestations on his part during the summer and fall of 1923.   True, these witnesses testified to isolated instances of irrational conduct, no one of which standing alone would perhaps justify the conclusion that during that time he was failing mentally, but the testimony of all the witnesses taken together presents an accumulation of irrational conduct which easily justifies, if it does not compel, the conclusion that during the summer and fall of 1923 his mental faculties were perceptibly and rapidly diminishing.   During that time his personal and business habits underwent a pronounced change.   He became shiftless in business matters and profligate in the handling of moneys, checks, drafts, etc.

In this weakened condition he was taken to the hotel at Chetek.   There he was introduced to the Reverend J. W. Irish, executive secretary of the *Hospital Association.*   The Reverend Mr. Irish called upon him frequently while he was at the hotel and during the time that he was confined at the Williams residence.   The testator did not welcome these visits of the Reverend Mr. Irish.   The Reverend Mr. Irish concedes in his testimony that the objects of these visits were twofold: first, to minister to his spiritual well-being; and second, to secure a bequest in favor of the *Hospital Association.*   During these times the testator expressed himself as displeased with the visits and importunities of the Reverend Mr. Irish.   He compared him to a buzzard hovering over a dead carcass.   He expressed the fear that at some time he might be persuaded to change his will.   Upon one occasion, when staying at the Williams home, he was called upon by the Reverend Mr. Irish together with an attorney.   They

had a will prepared, which the testator refused to execute. There is evidence in the record that the Reverend Mr. Irish expressed himself as being greatly disappointed by reason of the refusal of the testator to execute the will upon this occasion. After they left, the testator told Mrs. Williams of the efforts of the Reverend Mr. Irish to induce him to sign the will. He told Mrs. Williams that he was then, and for some time had been, very much afraid that the Reverend Mr. Irish would prevail upon him to sign this kind of a will, because, he said, "I am getting weaker and weaker; my body is getting weaker, and as my body grows weaker my mind will grow weaker, and a big strong man like Mr. Irish, with a physique like that man has, talking to a poor, old, weak man like me, he is bound to finally break me down."

After that occurrence Mrs. Williams wrote to *Mrs. Nichols,* a sister of the testator living at Sparta, advising her that Mr. Walker was at her residence and that he would be glad to see any of his relatives who could find it possible to come, if only for a few hours. She further stated: "So far Mr. Walker's mental faculties are unimpaired, but he has expressed fears that should he become very weak the constant suggestion of several solicitors for a certain hospital might finally work on him to such an extent as to cause him to sign the will they have all ready drawn up leaving all his property to that institution." This letter was written on November 21st, and within two or three days thereafter his brother *Charlie* and two sisters came and removed him to the home of his sister, *Maggie Starkey,* at Sparta, where he remained until December 30th, when he was taken to the hospital at Sparta for a blood transfusion. The Reverend Mr. Irish continued his visits while he was at the home of his sister, calling upon him a number of times. *Mrs. Starkey* and her husband testified that upon one occasion, when they came to the door of the room, the Reverend Mr. Irish had his arm across the body of the testator and was appealing

to the testator to make it fifty thousand, to which the testator responded, "No," "No," "No." It may be said that this is denied by the Reverend Mr. Irish. The trial court, however, had a right to find that such was the fact.

After his removal to the hospital at Sparta the Reverend Mr. Irish continued his calls and visits, and on January 7th the testator executed the will in question, which was prepared by the Reverend Mr. Irish, according to his own admission. After the execution of the will the Reverend Mr. Irish, in effect, took charge of the testator, and the testator showed feelings of antipathy towards his relatives. During the last few days of his stay at the hospital at Sparta he manifested antipathy towards his relatives and referred to them in very much the same terms that he referred to the Reverend Mr. Irish during the early intrusions of the Reverend Mr. Irish at Chetek. Without consulting his relatives, the Reverend Mr. Irish directed his removal to the Methodist Hospital at Rice Lake, and personally accompanied him on the trip. From that time until his death the testator manifested the most friendly feelings towards the Reverend Mr. Irish and an antipathy towards his relatives. He did not want them to call on him. He did not want to see them. He would not permit their letters to be read to him.

We do not deem it necessary to review the well-established principles that govern cases such as this. As said by the county judge in a very cogent opinion:

"The rules by which the execution and validity of any last will in dispute are governed and tested are so familiar that they need only to be concisely referred to to focus our attention upon the general material aspects of the great mass of testimony taken in this case, covering over 1,400 pages, much of it being minute and inconsequential."

The county court held that, although the testator had mental competency to make a will on the 7th day of January, 1924, nevertheless the will in question was the result of un-

due influence. In order to justify this conclusion the county judge found the existence of the well-known four elements necessary to constitute undue influence: (1) susceptibility of the testator to such influence; (2) a disposition on the part of the agent of the *Hospital Association* to exercise it; (3) opportunity to do so; and (4) a result indicating it was exercised. The Reverend Mr. Irish freely admitted that he was soliciting a bequest from the testator in favor of the *Hospital Association*. From this testimony alone, taken in conjunction with the undisputed facts in the case, a conclusion that there existed on his part a disposition to exercise such influence as was necessary to secure the bequest, certainly cannot be disturbed. That he had ample opportunity to exercise such influence is abundantly established. The result indicates its exercise. Some influence had induced the testator to disinherit his relatives and substitute the *Hospital Association* as the principal beneficiary of his will. Scarcely more than a month prior to the execution of the second will, and at a time when he was stronger both physically and mentally than he was at the time of the execution of the will, he had declined to make such a will. In November he referred to the Reverend Mr. Irish as a buzzard and a coyote. He was on friendly terms with his relatives, and expressed a desire that they have his property. In January he manifests an antipathy toward his relatives and embraces the Reverend Mr. Irish as his friend and comforter. Manifestly a change had been accomplished in the attitude of the deceased. That this change was brought about by reason of the importunities of the Reverend Mr. Irish cannot be doubted.

The existence of three of the elements necessary to find undue influence, namely, an opportunity for the exercise thereof, a disposition to exercise it, and a result indicating its exercise, is so convincingly established by the record in this case that argument to the contrary is the merest casuistry. That the testator was susceptible to undue influence

may not be so convincing. The trial court, however, found such to be the case. In *Elliott v. Fisk,* 162 Wis. 249, 253, 155 N. W. 110, it is said:

"While it is true that a testator susceptible to undue influence; an opportunity for the exercise thereof; a disposition to exercise it; and a result indicating its exercise must be established by clear and satisfactory evidence before a court is justified in setting aside a will, yet the clear establishment of three of these essential elements may with slight additional evidence as to the fourth compel the inference of its existence."

While we are convinced that the record abundantly justifies the finding of the county court that the testator at the time of the making of the will on January 7, 1924, was susceptible to undue influence, the application of this rule places the question whether the finding of the county court in this respect can be reversed, beyond any controversy.

Although the able and reputable counsel for the *Hospital Association* very properly and earnestly stresses many isolated circumstances disclosed by the evidence in an effort to compel a contrary conclusion, such evidence casts little if any doubt upon the history, chronology, general purpose and character of the transaction which we regard as the outstanding, dominant, and controlling consideration.

The judgment in this case well might have been affirmed without an opinion. Such would have been its disposition could we have passed in silence the circumstances here spread before us. None but the most truculent sensibilities can contemplate with equanimity the methods employed to procure the execution of this will. It may be assumed that the Reverend Mr. Irish consoled his conscience with the reflection that the end justified the means. This, indeed, is more charitable than to assume that he regarded his conduct as in keeping with the proprieties of his sacred office, self-assumed, of spiritual comforter. No matter how worthy the cause he

sought to promote, that cause cannot hallow, cannot sanctify the means employed. The worthy nature of the cause rather emphasizes the sordidness of the means employed. He who under cover of ministering to the spiritual comfort of one conscious of approaching death covertly and subtly procures, directs, or suggests the disposition of temporal affairs contrary to a will expressed in health and strength, discredits the garb which proclaims his respectability.

One who is weak in sickness is easily susceptible to the influence of one whom he receives into his confidence as his spiritual comforter and adviser. Not only the proprieties and amenities of the relation but considerations of manhood and honor dictate that one occupying such a sacred relation shall studiously refrain from using his spiritual powers to accomplish temporal ends. That such powers can be prostituted to other than spiritual purposes is manifest. Consider the appealing influence on the mind of one sick unto death of a prayer made at the bedside of the testator, not by the Reverend Mr. Irish but by a brother Methodist pastor. A sister of the testator testified that she overheard the prayer, and testified to its nature and character in the following language:

"I could not repeat the whole prayer that Reverend . . . made, but I can tell you of the meaning in part: he said the Lord had wonderfully blessed him with this world's goods; that his feet were on the verge of eternity and that he was about to go out into a new life. He says how nice it would be to leave this to the Lord's work, where it would be going on and doing so much good."

. While this was in form a spiritual supplication, it was in fact a temporal appeal, subtle but nevertheless effective upon the mind of a dying man. Such insidious appeals under such circumstances are unworthy the pretensions of one who proclaims that he has dedicated his life to ministering to the spiritual welfare of human-kind. A minister of the gospel should not only avoid evil but he should avoid even the ap-

pearance of evil. He should not only avoid prostituting his office to promote temporal desires, but he should avoid even the appearance of doing so.

In this case the Reverend Mr. Irish frankly admitted that his intrusive and unwelcome visits were prompted by a dual purpose and were made in a dual capacity. That this was a fact is not left to speculation. We well may believe that his dominant purpose was to procure a bequest for the *Hospital Association,* and that his desire to promote the spiritual welfare of the testator was a mere pretense and sham under cover of which he was enabled to intrude himself into the confidence of the testator. The results accomplished impugn the motives and loudly proclaim the abominable sordidness of his purposes. He not only directed the estate of the testator into unnatural channels, but he studiously and insidiously nursed an unnatural feeling on the part of the testator towards the relatives of his blood. Not only the will, of which he procured the execution, but the unnatural and unjustified feeling towards his brothers and sisters which the testator carried to his grave, marks the handiwork of the Reverend Mr. Irish. It is blasphemy to say that such results promote the work of God. It is sickening to think of such results flowing from the work of spiritual ministers. There is something ghoulish about this whole proceeding. If such undertakings meet with the approval of those who minister to the spiritual welfare, it is time that mere temporal sensibilities protest.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on June 20, 1927.