WILL OF LINK: NICHOLS and others, Appellants, vs. MON-
DAY and another, Respondents.

*May 1—June 11, 1930.*

For the appellants there was a brief by *Williams.& Wil-
liams* of Oshkosh and *Leo Torbe* of Chicago, Ill., and oral
argument by *George E. Williams*.

For the respondents there was a brief by *Barber, Keefe, Patri & Horwitz* of Oshkosh, and oral argument by *Frank B. Keefe.*

OWEN, J. The testator was eighty-one years of age at the time of his death. He had been for many years a resident of Milwaukee county. He owned some property in the city of Milwaukee consisting of a flat building or apartment house, the rents from which yielded him a monthly income. He also received a pension of $65 a month from the government. He was very frugal in his habits, and denied himself not only the comforts but the full necessities of life. He supplied himself sparsely with the plainest of food. He permitted his property to run down and deteriorate. He never carried insurance on his buildings because of his indisposition to spend money in that behalf. When urged to do so, he said that if they burned down his pension would support him, and that if his children wanted them insured they could pay for the insurance.

The four contestants are his children. Until the 1st of July, 1928, the most natural and cordial relations existed between the testator and his children, the most conclusive evidence of which is that he executed one will on the 9th of February, 1928, and another on the 9th of June, 1928, in both of which he left to them all of his disposable estate, share and share alike.

The testator had a serious illness in January, 1928, and remained in poor health thereafter. His daughter Katy, who was divorced from her husband, kept house for him. She had her children with her, one of whom was a boy, whose noisy and boisterous conduct greatly irritated the deceased. The boy's presence finally became such an annoyance to the testator that, sometime during July, Katy took the boy to Chicago with the determination of turning him over to his father, the divorced husband. While she was gone, however, her daughter remained to keep house for

her father. In her absence on this mission, Chris Monday and Mayme Monday, a nephew and niece of the testator, came from Oshkosh to Milwaukee on Sunday, July 22d, and urged him to go with them to Oshkosh. They represented that they had a cottage on the lake, where he could enjoy the sunshine and fresh air to the great benefit of his health. He did not go with them on that day, but on Sunday, July 29th, they returned, and he accompanied them to Oshkosh. There was nothing said at the time about his taking up his permanent abode with the Mondays. He made no attempt to arrange or adjust his business affairs in Milwaukee. Upon his arrival at Oshkosh, the Mondays devoted themselves to his care and comfort. Chris Monday gave him a bath, cleaned him up, bought him a new suit of clothes, and took him out to the cottage on the lake. Those of his friends and acquaintances who saw him upon a visit to Milwaukee shortly thereafter, remarked that he looked better—at least cleaner—and gained the impression that the change in climate was beneficial to his health.

On the 8th day of September, 1928, the testator executed a bill of sale of his car to Chris Monday for the expressed consideration of one dollar. On the 9th day of·September Chris Monday went to Milwaukee and got the car. On the 10th day of September the testator executed a will leaving his entire estate to Chris Monday and Mayme Monday. On the morning of September 20th he died. In the forenoon of September 20th, the petition for the probate of the will executed September 10th was filed in the county court of Winnebago county. The objections to the probate of the will were, that the testator had not sufficient mental capacity to make a will, and that the will was procured by undue influence exercised upon him by Chris Monday and Mayme Monday, the beneficiaries named in the will.

The county judge found that at the time of the execution of the will the testator was of sound mind, that no undue influence was exercised upon him to procure the execution

of said will, and that the will is the full and unconstrained product of a free and independent mind. Although the county judge wrote an opinion, he did not attempt to review or analyze the evidence before him, for which reason we do not have the aid which an analytical review of the evidence would afford us, nor can we be certain that he applied to the evidence correct principles of law. For instance, it is said in the opinion that to establish "fraud and undue influence, two points must be sustained: first, the fact of deception practiced or the undue influence exercised, and second, that this fraud and influence were effectual in producing the alleged result, misleading or overcoming the party in this particular act; and further, that fraud or undue influence, to avoid a will, must be practically connected with its execution. The court will not go into the details of its reasoning, but sufficient to say that the scrivener of this particular instrument was a respectable and reputable member of the Winnebago bar. And secondly, that the attitude of our supreme court, since the decision of *Ball v. Boston,* volume 153, page 27, Wisconsin Reports, down to the recent case of Harriet J. Wallace, deceased, it is well-nigh impossible to set aside a will on the grounds of undue influence, fraud, or coercion."

In view of the doubtful proposition of law declared, and in face of the disconsolate view expressed by the county judge as to the attitude of this court in such cases, and the very general, if not casual, treatment of the evidence in the case, it seems incumbent upon us to review the evidence somewhat in detail, and then to deduce the conclusions which a correct application of the principles of law seem to demand, to some extent at least, independently of the conclusions announced by the county judge.

First we may say that we agree with the conclusion of the county judge that at the time of the execution of the instrument the testator was of sufficient general mental

capacity to make a will. It does appear, nevertheless, that at the time of executing the will he was laboring under delusions with reference to his children, which there is much reason to believe influenced his treatment of them in his will. But we find it unnecessary to consider whether such delusions were in and of themselves sufficient to defeat the will, as they will be accorded proper and full significance in our consideration of the question of whether the will was the result of undue influence.

Chris Monday and Mayme Monday were children of testator's deceased sister. Chris Monday was sixty-two and Mayme Monday forty-five years of age. Both were unmarried and they lived together. Prior to July 22, 1928, the intimacy between them and the testator was that of comparative strangers. Chris Monday testified that he saw the testator at his father's funeral in 1922 and at his sister's daughter's funeral in 1925, and that he had never been intimate with him nor visited back and forth. Mayme Monday testified that she saw the testator in 1926 at her store. His son came into the store, but the testator did not come in. "Mr. Link said 'Hello' through the screen door to me. I couldn't neglect my customers and take care of visitors. I didn't shake hands with him, although I had not seen him for some time at that time."

The relations existing between the testator and his sister's children are well illustrated by the testimony of Emma Monday, the wife of a brother of Chris and Mayme Monday, who testified that she did not know testator's children very well; that she had met just one daughter once.

With this understanding of the relations existing between the testator and his children, and the relations existing between him and Chris and Mayme Monday, we see that on July 22, 1928, Chris Monday and Mayme Monday journeyed to the home of the testator at Milwaukee and urged him to come and live with them. This prompts the inquiry of how

they happened to go to Milwaukee on July 22d. The answer is to be found in the testimony of Margaret Geffers, a sister of Chris and Mayme Monday, who stayed with the testator a few days while her son was looking for work in Milwaukee. She says that when she concluded not to stay longer, the testator urged her to live with him, telling her that he was not receiving proper care from his children, and he would like to have her there. She decided not to stay, and the testator told her to send Chris and Mayme down, "because somebody has to come; I have got to have somebody here." She reported this to Chris and Mayme, and their visit to Milwaukee on July 22d followed. Within about six weeks from the time they took him to their home in Oshkosh he made his will, leaving them his entire estate.

This indubitably reveals a most striking change in the attitude of the testator towards his children. It is possible that this change of attitude—great as it was—might have resulted naturally, and, if so, he had a right to disinherit his children. It must be appreciated that it might have been brought about by the exercise of undue influence on the part of Chris and Mayme Monday. It must also be appreciated that the new interest which Chris and Mayme Monday suddenly took in the testator may be attributed to kindly and benevolent motives. So, too, it must be appreciated that such new interest could spring from sordid and mercenary motives. The evidence which will throw some light on these alternative situations, both with reference to the change of attitude on the part of the testator and the motives which inspired Chris and Mayme Monday to a new interest in his welfare, is in part as follows:

John Kluwin, Esq., of the Winnebago county bar, drew the will of September 10th. Mayme Monday went to his office in the morning of that day and told him that her uncle wanted to see a lawyer. He asked her what he wanted to see a lawyer about and she said she did not know. Although

he had not met the deceased before, he responded to the call and went out to the cottage to see him. The testator told him that he had property in Milwaukee which he wanted to dispose of and get the cash, and turn it over to Chris Monday to handle for him during the remainder of his life, and after that was over the people who took care of him were to have what was left. In this conversation he inveighed against his children. He found fault because he had given his daughter Katy the money to pay for the drawing of the will of June 9th and she had not paid it over, as indicated by a dunning letter which he had received from the lawyer. He complained against his son William Link because, he said, he had stolen the number plates from the testator's car. He told him that his daughter Frances was a bad woman; that "they [his children] got my money down there, and when they got my money and possession of the papers, they ran and left me." He said that his good friend Haussman in Milwaukee said that he did not think he did right in leaving his property to his children. The testimony of Chris and Mayme Monday is to the effect that he said he never wanted to see his children again, and that he did not want them to come to his funeral.

That these expressions of the testator *are not* in accordance with the facts *is* established by the undisputed evidence. The daughter Frances whom, it was said, the testator termed a "whore," was his favorite child, whom he had always loved, and who spent three weeks in January, at the peril of losing her position in Chicago, ministering to him during his sickness. There is no evidence to show that she was the kind of a woman which his statement imputed to her, nor is there any reason to believe that he thought so prior to the time he went to live with the Mondays. There was no truth in the statement that his children had gotten his papers and ran off and left him. His daughter Katy stuck by him, and left him only during the time when she was trying to find a

place for her son in Chicago; during which time she left her daughter to keep house for the testator, which she did in a competent manner. Granting that Katy was absent during this time, it cannot be said that she ran away and left her father. The mission which took her away was to relieve her father of the annoyance which the presence of her son occasioned him—a mission which imposed upon her responsibilities for the welfare of a son as well as the comfort of a father. The record contains a letter received by the testator from his daughter Margaret in California, which is a complete refutation of the insinuation that she had gotten his money and ran away and left him. His statement that his friend Haussman had thought that he had done wrong in leaving all of his property to his children was not true. Haussman himself testified that he never said any such thing, and that the only remark he ever made remotely in that connection was a statement made to Chris Monday on September 9th, when he spoke of the clothes which Chris Monday had bought for the testator, of the manner in which Monday was taking care of him, and suggested that the testator ought to remember him in his will to the extent of a couple of hundred dollars so that he would be paid for his trouble. Now if the testator had ever heard of such a remark made by Haussman, he heard it from the lips of Chris Monday, and the remark made by Haussman was magnified in the telling if it conveyed to the mind of the testator the impression which he communicated to Mr. Kluwin.

It does appear to be true that the son William Link took the license plates off from the testator's car and used them on his own car, and, while it appears that the testator did not like it, the incident occasioned nothing in the nature of a permanent rupture between them. After the number plates were taken, the testator made the will of June 9th, in which his son William was a beneficiary equally with his

other children and, in addition, was made one of the executors of the will.

There is much in the testimony of Chris and Mayme Monday to the effect that the testator was embittered towards his children, but there is no testimony on their part that they remonstrated against the testator's unnatural feeling, or said anything to remind him of the natural relations existing between him and his children, of the duty which he owed them, or to urge him to forget his grievances, real or fancied. This would have been the natural impulse of high-minded and generous natures.

On September 8th a lawyer was summoned to the cottage to transfer the title to the automobile of the testator to Chris Monday. While Monday testified that he did not want the automobile, it was rather for the reason that he had no use for it and doubted whether it was worth taking. If he made any remonstrance to the testator about giving him the automobile, which is not very clear, he did not put it on the ground of testator's duty to his children. On September 9th Monday went to Milwaukee and got the automobile. While at Milwaukee, Haussman said to Monday that the testator should remember him in his will. On September 10th an attorney is called to the cottage and a will is made. The testator expresses the view that his friend Haussman will be pleased with his disinheritance of his children. The only remark Haussman made to any one concerning the testator's will was made to Monday the day before its execution. The testator died at 3:30 in the morning of September 20th. In the forenoon of September 20th Chris and Mayme Monday called at the office of their attorney and, before any arrangements were made for the funeral, or to notify relatives, a petition for the probate of the will of September 10th is filed by Chris Monday.

We do not intend to attach undue significance to this incident. It is probable that from the standpoint of the

lawyer representing the interest of Chris and Mayme Monday there was a tactful advantage in having that petition filed early. But the significance of the incident is that it shows a militant disposition on the part of Chris and Mayme Monday to assert and enforce their rights under the will. If we concede that their interest in the testator from July 22d down to the date of his death might have been prompted by friendly and charitable motives, we search this record in vain for any corroboration of such hypothesis. Their relations with him throughout the years give no evidence of a sense of kinship. There were no visits back and forth. During a period of six years Chris Monday saw him but twice in Oshkosh, and that was at funerals. When he said "Hello" to Mayme Monday through the screen door of her store, neither made the necessary effort to shake hands with the other. Chris Monday seemed to immediately acquire an influence over the testator which neither his children nor his immediate friends were enabled to exercise. One of the first things he did was to induce him to buy a new suit of clothes. Chris Monday admits that he paid for it, but that it was understood that the testator was to pay him back when he got his pension check. This is the only evidence in the record as to whether there was such an understanding. If there was such an understanding, then Chris Monday induced him immediately to an extravagance which was not in accordance with his established habits of life. If there was no such understanding, then the incident paved the way to the favor of this physically and mentally weakened old man. The testator's changed attitude towards his children was not discouraged by his new-found friends. Whether it was encouraged by them, no one testified except the beneficiaries under his will. We do know that there was nothing in their attitude to conciliate the harshness of his changed disposition towards his children, nor to impress him with his filial duties and relations. If it be too much to say that

their attitude betrays a grasping disposition, it does at least betray them as willing recipients of his bounty undisturbed by the resulting injustice to his children.

That we have here two of the four elements considered necessary to establish undue influence is not disputed, namely, an opportunity for exercising undue influence and a result indicating its exercise. The evidence also clearly establishes to our satisfaction an easy subject of undue influence. The testator had a serious illness in January and, although his condition improved, he was nevertheless a sick man from that time until his death. His Milwaukee physician diagnosed his ailment as dropsy and cancer of the intestines. The Oshkosh physician who attended him just prior to his death testified that he had edema and severe asthmatic attacks which tended to weaken him a good deal. That he was physically weak is certain. A weakness of mind resulting from his physical condition was quite natural. The hallucinations which he entertained with reference to his children, positively indicate that he was far from his normal mentality. Such hallucinations either amounted to delusions which of themselves would be sufficient to set aside the will, or they indicate the result of undue influence exercised upon his mind.

We have then three elements necessary to constitute undue influence satisfactorily appearing. The only remaining element is a disposition on the part of the beneficiaries of his will to exercise undue influence upon the testator. As to this, there is no direct evidence. However, it is held that where three of the elements are established by clear and satisfactory evidence, slight additional evidence as to the fourth may compel the inference of its existence. *Elliott v. Fisk,* 162 Wis. 249, 155 N. W. 110; *Will of Walker,* 193 Wis. 264, 213 N. W. 626.

In *Elliott v. Fisk* the three elements essential to constitute undue influence were satisfactorily established, and as

to the fourth, a disposition to exercise undue influence, the court said: "Perhaps the strongest inference that such disposition existed may be drawn from the fact that they now seek to retain what was gratuitously given as against an aged father who would otherwise have been entitled thereto, and from the fact that the result appears to have been the effect of such influence." In this respect the two cases are very much alike. But the facts of this case furnish much stronger evidence justifying an inference of a disposition to exercise. undue influence. In this case the testator had recently made two wills, preferring his children.. The will here under consideration indicates a most striking revulsion of feeling toward them. It is hard to account for this revulsion of feeling unless it was accomplished by outside influences. This was not present in the. *Fisk Case,* because there the testator had never intended to make a will, for the reason that he did not consider his estate of sufficient importance to justify making a will. Here we see a most unusual interest springing up suddenly on the part of the Mondays in the welfare of the testator. This interest is prompted by a report of his condition made to them by their sister. Other significant circumstances appearing from what has already been said might here be summarized to compel the inference that the will was the result of undue influence exercised by Chris and Mayme Monday. But to do so would be to prolong an already lengthy opinion. Suffice it to say that we are convinced that an impartial weighing of the evidence compels the conclusion that the will of September 10th was not the will of the testator, and that it should not have been admitted to probate.

*By the Court.*—The judgment appealed from is reversed, and cause remanded with instructions to deny the probate of the will.