WILL OF TRUEHL: RAEMISCH and another, Appellants, vs. KIRCHSTEIN and others, Respondents.

*December 6, 1935—January 7, 1936.*

*Robert N. Nelson* of Madison, for the appellants.

For the respondents there was a brief by *Richmond, Jackman, Wilkie & Toebaas* of Madison, and oral argument by *Oscar T. Toebaas.*

FAIRCHILD, J. The trial court, in a very carefully prepared opinion, points out the difficulties experienced in deciding the case, and said: "The problem therefore is not easy to decide, but there are certain outstanding facts which, when examined in the light of the law, determine certain results to which this court has reluctantly come," and announced his conclusion that the burden which the circumstances placed upon the proponents of overcoming suspicions had not been met, because:

"(1) The evidence shows that there was every opportunity to exercise undue influence.

"(2) The result fully indicates its exercise.

"(3) The testator was susceptible of undue influence, being old, feeble, mentally weak, and suffering physically with an incurable disease that would lead him to be suspicious and have delusions, as is evidenced by the hospital record and the witnesses.

"(4) A disposition on the part of the beneficiaries to exercise such influence, while not positive, direct, or evidenced by overt act, except the insistence of Mrs. Hazel Rodebush to have the will drawn, yet with the Raemisch family being unable to overcome all the presumptions against them, the court must conclude that Robert Truehl, at the time of executing said will, and for some days previous thereto, was not mentally competent to draw a will, and that the same was procured by what is sometimes designated as 'insidious influence,' which is not positive, overt or definite at any particular period, and yet has its influence over a weak and trusting mind that has been laboring under misinformation and delusions in his last sickness."

A will is the result of undue influence when the evidence shows a disposition to exercise such influence over a testator, opportunity for its exercise upon a susceptible subject, and a result indicating its exercise. *Will of Link,* 202 Wis. 1, 231 N. W. 177. In the case just cited, three of the elements were established by clear and satisfactory evidence, and slight additional evidence as to the fourth compelled an inference of its existence. The conclusion reached that the will was the result of undue influence in the case at bar is not so sustained, and the trial court was, we apprehend, influenced by the assumption that the result indicated the exercise of undue influence. It is urged by the contestants that the beneficiaries occupied a confidential relation to the testator, and that they have not overcome the presumption that undue influence was exercised by them; they having received the entire estate. To begin with, where a stepfather, by his will, makes his stepson a beneficiary, there does not necessarily result an unnatural will. It may be a most natural will. When weighed in this light, and when due consideration is given to well-understood motives, emotions, and purposes, the disposition made of his property by this testator is not unnatural. The evidence supports the conclusion of the learned trial judge, as stated in his opinion, that "the relations with his own family were friendly, but not very intimate." On the other hand, Frank C. Raemisch, who with his wife was a beneficiary under the will, was the stepson of the testator, having come into this relation with the testator when but six years of age. A life-long association existed between them. This relationship appears to have approached, somewhat, the natural and usual one of father and son. After Frank C. Raemisch's marriage, he lived near the testator, and was the one in all the family connection to whom the testator turned when in need of assistance. While there is no evidence of a great display of paternal affection

on the part of the testator, who seemed to have preferred to live by himself, in his own way, the evidence is that he turned toward Raemisch and his family in his time of distress, rather than to his brothers and sister. When he suffered a broken leg some years before his death, he depended upon, and was cared for, during that ordeal, by Frank C. Raemisch and by Mrs. Raemisch. His mode and habits of life indicate a nature desiring to be free and independent of relatives and friends, but when in need of assistance, he called on the Raemischs. The fact that his brothers and sister did not live in Waunakee does not change the value of the evidence tending to show Truehl's attitude toward the Raemischs. When his last sickness came, he made it evident by word and act that his preference was to continue to live in his own home, or in the home of the Raemischs, where he might have the ministrations of his stepson and stepson's family. In August preceding his death, after the Raemischs had notified the brothers of his failing health, Truehl, in response to the suggestion from his brothers that he go to the home of one of his relatives, announced his intention to stay in Waunakee. Frank C. Raemisch recognized a filial duty toward Truehl, and Truehl evidently considered the existence of that relationship as fixed, and assumed that the benefits that ordinarily go with that status were his to command. He refused to go to the hospital unless he could be accompanied by a daughter of Frank C. Raemisch, a trained nurse. Plans were made to conform to his wishes, and he placed himself under the care of the Raemischs. Raemisch inquired concerning Truehl's ability to pay reasonable charges for hospital, medical, nursing, and other necessary care, and intended to charge the amount thereof against the stepfather's estate.

It is established that Truehl, after reaching the hospital, determined to make his will. It appears that Dr. Blake visited Truehl at the hospital October 3d, and Truehl told

him that "he wanted to make out his will and wanted to go home first." It is also established that he gave to the nurse a statement of the contents of the will as he wished it to be made. He enjoined upon her the securing of a proper scrivener therefor. Some of the evidence relied upon by the contestants shows activity on the part of the nurse, the daughter of the beneficiaries, in providing the testator with the opportunity to make his will. But there is lacking in this case any evidence of overreaching on her part.

Where one, competent to do so, has determined to make a will, and has definitely decided upon the provisions he intends to incorporate in it, and another, at the testator's request, assists in procuring the execution of the will, such other person is not exercising undue influence, there being no suggestion coming from the one so acting, as to the terms the will is to contain. At the request of the testator, the nurse first attempted to summon a banker, who had been an adviser to Truehl, and with whom Truehl had done business for many years. When this friend of Truehl's failed to appear, she telephone her father and inquired why the man had not responded to the call. When informed by her father that the banker would not come, because he felt he could not, with propriety, "go out and draw a will," upon the suggestion of her father, she sought to secure the services of one who had been an attorney in years past for Truehl. The attorney visited Truehl at the hospital. He did not draw a will because at the time of his two visits it was his opinion that Truehl was not sufficiently clear mentally to make a valid will. When the attorney left, it was with the understanding that if Truehl brightened up, the attorney should be notified, and that he would return. On Sunday, October 7, 1934, the day before leaving the hospital, the nurse, being of the opinion that Truehl was capable of attending to the matter, attempted to reach the attorney, but was unsuccessful in doing so. The following day the testator, with his nurse,

returned to the home of the Raemischs. Having returned to the Raemisch home, he summoned an old friend, a justice of the peace, whom he requested to draw the will, and the will was drawn. The evidence shows the will to be the act of the testator, free from the exercise of undue influence. There is no opportunity here for application of the rule that slight additional evidence may compel the inference of the existence of one of the necessary elements in the establishment of the exercise of undue influence in the making of a will. Those elements which must necessarily exist in order to establish the exercise of undue influence are not present in this case even though the testator was ill. There is no evidence that Frank and Mary Raemisch, who were made the only beneficiaries under the will, attempted in any way to exercise any influence over the testator. They made no attempt to encourage the execution of a will; they never mentioned the subject in his presence, or talked about it with each other. They did not notify his brothers and sister that he was in the hospital, but this cannot be considered as indicative of an intention to keep him away from his kin while he was considering making a will. Truehl had been in the hospital for several days before the Raemisch family had any knowledge that Truehl desired to make a will.

When we come to examine in detail the testimony offered in support of the contestants' proposition that Truehl was mentally incompetent to execute a will, we find that the evidence does no more than show that at the time Truehl was visited by his former attorney he was, either as a result of medicine which had been administered, or the effects of his illness, temporarily incapable of executing a will. There is no evidence of lack of capacity at the time of the execution of the will, October 10th. The condition of the testator, as observed by the attorney when he called at the hospital in the morning of the 5th and 6th, was not a continuing one, and its existence does not establish such infirmity of mind as would preclude the possibility of the recurrence of mental

capacity and active memory sufficient to collect in his mind and comprehend the condition of his property, and his relation to persons who might properly be his beneficiaries, and to hold these things in mind a sufficient length of time to perceive their obvious relation to each other, and to be able to form some rational judgment in relation to them. *In re Butler's Will,* 110 Wis. 70, 85 N. W. 678; *Will of McLeish,* 209 Wis. 417, 245 N. W. 197. The trial court, however, was of the opinion that the testator suffered from a delusion "that his brothers and sister had done nothing for him, and did not care for him; and such notion was untrue in fact, and contrary to the facts." If the testator's mind was so affected that he labored under a delusion of mistreatment by his family, the doctrine followed in the case of *Will of Lundquist,* 205 Wis. 667, 238 N. W. 861, would apply here; but incapacity to make a will is more than weakness, and a delusion does not exist merely because a testator has interpreted certain statements or acts of others in his own way. The testator in this case was an elderly man, seriously ill; but when he acted in the matter of drafting his will, he displayed the necessary vigor of mind and body to enable him to perform that act. Given its full significance, the relationship which, through the years, had grown up between the beneficiaries and the testator, throws light upon the testimony of the scrivener and others upon this particular subject. It quite clearly appears that Truehl favored the Raemischs. He preferred to be with them. This preference was based on and was the result of association, connection by marriage, and mutual recognition of family ties. He had not, for years, been in as frequent or intimate association with his brothers or sister as he had with the Raemischs. When the scrivener referred to Truehl's brothers and sister, and spoke of their not being included in the will, the testator replied: "My folks have never done anything for me, Frank and Mary have done it all." This does not furnish a foundation for holding that there existed a delusion. It is rather the natural expression

of a man who, for a long time, had lived within a short distance of his stepson, and during all that time had depended upon and had regarded Frank C. Raemisch as one on whom he could depend. Whether the somewhat derogatory remarks attributed to him when in the hospital, in speaking of his next of kin, were comments on facts as he understood them, or statements in justification of his contemplated action, they do not show evidence of a delusion affecting ability to distribute an estate, or one that influenced the selection of the particular persons as beneficiaries. He lived, as a result of circumstances, in closer and friendlier relationship with Frank and Mary Raemisch than he did with other members of his family.

The notations on the hospital chart, and the testimony of the attorney and others who visited Truehl in the hospital October 5th and 6th, do not refute the testimony of Dr. Blake, a friend, neighbor, and attending physician, that the testator was normal October 10th, the date of the execution of the will; that his mentality was such that he could comprehend what property he had, and who were the natural objects of his bounty. The scrivener who prepared the will, and the witnesses to it, saw nothing in the actions or conduct of the testator which aroused suspicions, or caused them to doubt the ability of the testator to make a will.

We have reached the conclusion that the findings as to undue influence, and as to the existence of delusions, are against the great weight and clear preponderance of the evidence. The will must be admitted to probate.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.

The following memorandum was filed February 4, 1936:

PER CURIAM. The mandate heretofore entered is amended by adding thereto:

Costs of appellants when taxed to be paid out of the estate.