WILL OF SULLIVAN: HIGGINS and another, Appellants, vs. KELLEY and another, Respondents.

*May 13—June 10, 1947.*

*John H. Rouse* of Baraboo, and *Charles P. Curran* of Mauston, for the appellants.

For the respondent F. H. Kelley there was a brief by *Robert Dougherty* of Wisconsin Dells, and *Langer & Cross* of Baraboo, and oral argument by *Mr. Dougherty* and *Mr. H. M. Langer*.

For Otto Krause, proponent of the will and objector to the codicil, there was a brief by *Hill, Beckwith & Harrington* of Madison, and oral argument by *John T. Harrington*.

ROSENBERRY, C. J.   On the appeal of the objectors, it is contended: (1) That by reason of his age and physical condition the testator was incompetent; (2) that while the trial

court properly found opportunity and disposition to influence on the part of Dr. Kelley and Krause, the finding of the court that the testator was not susceptible to influence at the time the will was executed July 18, 1945, is not sustained by clear, convincing, and satisfactory evidence; (3) that the evidence shows that the testator desired to die intestate, that he was influenced to prepare a will by Krause and Dr. Kelley and for those reasons the will should have been denied probate.

The trial court in the opinion, which shows careful consideration of the evidence, states the facts, and the statement here made will be based largely upon the opinion of the court. The testator at the time of his death was eighty-four years of age and was suffering from cerebral thrombosis resulting from arteriosclerosis with complications, chronic heart disease and chronic bladder ailments, from which he had progressively suffered for several years. His wife predeceased him by five years. He had no children. For many years his closest relatives were first and second cousins, many of whom lived in Wisconsin, some around Reedsburg. However, there was no close contact between him and these cousins.

For the last twenty-five years of his life, the testator lived at his home in Reedsburg. Prior to that time he had lived on a farm which he owned. In his later years he lived on the first floor of his home and rented the upstairs to various people who as a part of the rental administered to some of his needs. Part of the time he had additional help to care for him.

He was frugal to the point of being penurious; at times profane; always outspoken; and vacillating in his views. He asked no odds of his relatives, was critical and suspicious of his in-laws. He was tendered and at times accepted much valuable assistance from his kindly, elderly neighbors with the promise that he would do something in the future but did not carry out his promises. At times he seemed opinionated, and again he was yielding to argument.

Otto Krause of Reedsburg, a former banker and more recently an investment broker, was his most trusted agent and friend. At the time of his death the testator had acquired property which was inventoried at $6,000 real estate (his homestead) and personal property of the value of $67,010.86.

By 1945, the testator's physical condition had reached a point where he had some dizzy spells. His health and mental processes varied from day to day. On June 15, 1945, he suffered his first bad spell, during the course of which he apparently wandered away a few blocks and was found on the edge of a stream, more or less in a stupor and was later returned to his home.

This incident indicated to the testator's friends that he was perhaps entering the last phase of his life. As a result of this, Krause conferred with the friends of the testator and, although he was his closest confidant, he then learned for the first time of the existence of Dr. Frank H. Kelley of Merrill who was a brother of the late wife of the testator. As the trial court said:

"Quite naturally, therefore, the one doctor among all of the sick man's close friends, relatives and in-laws, was sent this telegram by Mr. Krause"

as soon as it was discovered that the testator was missing. The telegram was as follows:

"Dan Sullivan missing since last night. Call me on phone."

A few hours later, a second telegram was sent to Kelley by Krause, as follows:

"Mr. Sullivan has been found and is home. Letter follows."

From the time of the appearance of Dr. Kelley on the scene the trial court stated the evidence chronologically as follows:

June 15, 1945.

Mr. Krause brought Dr. Kelley to Reedsburg from Lyndon Station in the late afternoon. They discussed the testator, whether there was a will, and other phases of his property. Dr. Kelley said Mr. Sullivan should have a will, and according to Mr. Krause, Dr. Kelley said: "I will see to it that the Kelleys get a good share of it." (Previous to this day, Mr. Krause had tried to convince the testator he should have a will, but the subject was always evaded.) That evening they called on the testator; found him too incoherent to discuss a will or business. Without request, and indeed, unknown to anybody else, the two of them went through Mr. Sullivan's safe and private papers to ascertain whether there was any will. They found none. Dr. Kelley returned to Merrill with the request that he be kept informed of developments.

June 16, 1945.

Letter from Dr. Kelley to Mr. Krause, repeated the request to be informed of any change. Extracts: "I am really the only one of his relatives that has ever done anything for him and I feel that I should be somewhat compensated for it as I am the closest to him. . . . If such a thing (lapse) happened . . . nothing would be able to be done with his property."

June 18, 1945.

Letter from Krause to Kelley. It informed Kelley that Mr. Sullivan is better. It concludes: "I am sure it will be alright for you to come down as originally planned and complete the will matters. I will do all I can to help you."

Messages between June 18, and July 19, 1945, between Mr. Krause and Dr. Kelley dealt with the physical condition of Mr. Sullivan. Extracts: "I think he is in pretty good condition, but I would suggest that we get the will fixed up very soon. I am afraid that he is failing. . . . He is now fully willing to go ahead with the will and I think he should do it before he changes his mind. . . . I will do all I can to help you."

July 18, 1945. (Date will was executed.)

Present with testator: Mr. Krause, Dr. Kelley, Attorney J. H. Hill of Baraboo, and his partner, Miss Miller. Dr. Kelley was asked to leave the room. It is disputed whether it was Attorney Hill or Mr. Sullivan who made the request. After all details were gone over, Attorney Hill dictated terms

to Miss Miller, who typed it. It was read to Mr. Sullivan, who signed it. During the procedure, Attorney Hill was about to walk out because he felt the situation was such that Mr. Sullivan could not exercise his free will in completing the will. Subsequently, the air was cleared, and the matter completed. Later in the day, Dr. Kelley asked for, and learned of, the general provisions of the will as they affected him. On July 30, 1945, and in response to his inquiry, Mr. Krause wrote to Dr. Kelley the details of the will, after he had conferred with Attorney Hill.

We will deal with the evidence relating to the codicil later in this opinion.

After stating the essential elements of undue influence as follows:

(1) A person unquestionably subject to undue influence.

(2) Opportunity to exercise such influence and effect the wrongful purpose.

(3) A disposition to influence unduly for the purpose of procuring an improper favor.

(4) A result clearly appearing to be the effect of the supposed undue influence;

the trial court stated the facts relating to the execution of the will as follows:

"Discussing the more obvious first, it cannot seriously be disputed from the evidence that there was an unusual opportunity for Mr. Krause and Dr. Kelley to exercise improper influence over the testator with regard to the will. The evidence is even stronger of a disposition to influence unduly for the purpose of procuring an improper favor. . . .

"To determine whether the result clearly shows the effect of the supposed influence requires a consideration of the will.

"After providing for the payment of his debts, $50 for Masses, $500 to the Reedsburg Catholic church, $5,000 to his first cousins as may be living at his death, $4,000 likewise to his second cousins, and $5,000 to the Mitchell family in whose household he was raised, he bequeaths $5,000 to Dr. Kelley as a gift to him and his family. Next, he gives $5,000 to the John Kelley family of Mauston, and $100 to Michael Kelley,

for which he frequently expressed dislike. These bequests total nearly $20,000. The balance of $53,000, less debts and expenses, he sets up in a trust fund for the further assistance of such of his named legatees as the county court shall best determine require it in the future.

"Inasmuch as the testator bequeaths $100 to Michael Kelley, a brother-in-law whom he dislikes, another $5,000 to John Kelley, who never did anything for him, I do not regard the bequest of $5,000 to Dr. Kelley as necessarily the fruits of undue influence. There is evidence that Dr. Kelley called on him occasionally, and that up to a few years ago the testator occasionally returned the call; that the testator previously had been heard to say he supposed he would have to leave him something, even though it is claimed he had on other occasions said that the Kelleys would get none of his money. Very obviously, he relented with reference to Michael and John Kelley, who had no contacts with him, and quite possibly he desired to remember Dr. Kelley in his will even tho he apparently cared little for him especially after Mrs. Sullivan's death in 1940. Everything considered, therefore, I do not regard that the will shows the result of undue influence.

"The testator was eighty-three at the time. He was infirm. His resistance was necessarily weakened. As to his susceptibility to influence, there is evidence both ways. His tenants could not influence him to follow their suggestions. From the letters of Mr. Krause, it is apparent that there were days when he could not induce him to discuss his business matters. He was certainly not of the silly, sniveling type, who readily agrees with the person who at the moment may be trying to influence him.

"It is true that at times he was receptive to argument, but if his own judgment was eventually exercised rather than the judgment of the other substituted for his own, he cannot be said to be one 'unquestionably subject to undue influence.' The element of 'undue' would be missing. Since the evidence is undisputed that his entire make-up was far from static from one day to another, I am of the opinion that on the day the will was executed, July 18, 1945, he was a man who could not be easily influenced.

"Dr. Kelley was apparently trying to suggest the terms of the will to him. The testator, in effect, ordered him out of

the room.   Dr. Kelley left and was gone for a matter of hours. During this time the testator was the dictator.   Dr. Kelley's gratuitous conduct not only failed to influence the testator, it angered him, instead.   It seems to me that what remained of 'old Dan's' early vigor and determination asserted itself at least for a few hours on the day in question.   And as already pointed out, our supreme court considers the evidence principally with respect to the day in question.''

Upon these facts the trial court found that the will was duly executed; that the testator was under no restraint and was of sound mind and possessed testamentary capacity.

It is considered that these findings are amply sustained by the evidence.   In addition to the facts stated by the trial court the testimony of the scrivener, James H. Hill, is significant. Judge Hill had not only been a practitioner since 1910 but was a former county judge of Sauk county and a man of large experience in probate matters.   Mr. Krause, whose connection with the will has already been stated, asked Judge Hill to come to Reedsburg on July 18th, to draw a will for the testator. The scrivener had never before heard of Dr. Kelley.   The scrivener took with him his secretary and met Krause and Dr. Kelley at Krause's office in Reedsburg.   From there the four of them went to the home of the testator.   The scrivener testified as follows:

"Since the last time I had seen him, I could see he was failing.   Talked rationally.   He looked tired, like an old man. The contrast was stronger to one who knew him formerly.   He looked weaker than the day I last saw him.   Seems to me he said he was eighty or past eighty.''

After the scrivener dictated the will, Sullivan spoke of a wandering spell he had had.   He said he could not depend on his head.   He was profane once in a while.   Spoke of a fall he recently had, of walking out to the old farm at night barefooted, and officers were sent out to search for him.   Said some days he was all right.   Said "Today I am myself'' and

that he had walked four miles out to that farm, did not know what he was doing.

The provisions of the will were discussed while Dr. Kelley was in the room. Dr. Kelley was there altogether approximately fifteen minutes. Inheritance tax was discussed; first and second cousins; Sullivan asked Otto Krause if he had heard of or located a certain woman; Sullivan said he had two first cousins—two Higgins brothers, in Baraboo. Kelley took no part until this point. He was sitting by Sullivan and Sullivan said in substance:

"I am not going to leave all my property to people who are not relatives; I won't stand for it. I won't draw any will."

Kelley started to say something and Sullivan said:

"Hell, I have heard all that before. This is my property. I have no further business to transact with you, it is pleasant on the back porch, you better go out there." Sullivan was angry.

The statements Kelley made that brought about this reply were in effect:

"Now, Dan, you know how we have talked this over; we are the nearest ones to you and are the only ones that have done anything for you."

Sullivan's outburst followed. Kelley then went out on the back porch. Judge HILL testified:

"I then packed up the papers that were on the table, carbon and Miss Miller's notebook and put them in my brief case. I told Sullivan I did not want to draw a will in this atmosphere. He said, 'Sit down. I got you up here. I want to think this over,' or something to that effect." After discussing some matters Sullivan decided to go on with the will and the scrivener decided to stay.

"Krause, myself and Sullivan were present during discussion of the provisions. . . . The interchange between Kelley and Sullivan was an unexpected thing."

Judge HILL states the details of preparing the provisions of the will: Fifty dollars was to be left for Masses; $500 left to the Catholic church at Reedsburg. The testator wanted a difference of $1,000 between the bequests to the first and second cousins, $5,000 to first cousins and $4,000 to second cousins. Testator then directed that $5,000 be given the children of Charles Mitchell, Wisconsin Dells, or their issue by representation. It appears that testator's mother died when he was twelve. He was taken by Mr. and Mrs. Mitchell who reared him. It was the only home he knew until he married. He did not know the members of the family but wanted $5,000 to reach the Mitchell blood somewhere because of the care Mrs. Mitchell had given him. (The money would not reach Mr. and Mrs. Mitchell who reared him but relatives of theirs.) He then directed a devise of $5,000 to Dr. Kelley; his first plan was around $1,000 or $2,000. He asked Krause to total the specific legacies to see what should be left in trust, as a result of which some of the specific legacies were raised. He was emphatic about not raising the amount of Michael Kelley, which was $100. He wished a trust created because he said most of his relatives were improvident. He wanted the trust to provide for the illness of the cousins, for Christian burial and so on.

The scrivener testified at considerable length in regard to discussions which he had with the testator at the time he signed the will. After it was signed, Sullivan told him to take it to Judge BOHN, the county judge of Sauk county. Judge HILL testified:

"After talking with Sullivan that day, I thought he was competent to make a will July 18. There wasn't any question in my mind about his competency. I was more or less shocked at the physical decline, but his mind seemed to be functioning; he was positive in his statements; I didn't like what had transpired there, but I thought Dan Sullivan was standing on his own feet and this was his will the way he wanted it.

I thought there had been some attempt at undue or improper influence, but I thought he had resisted it. I thought the will was the way Dan Sullivan wanted it. By attempt made to influence, I refer to what he said to Dr. Kelley."

While there was a great deal of evidence introduced both pro and con, much of it had little bearing on the mental condition of the testator. The determination was clearly one of fact and the findings of the trial court already set out must be sustained.

The objectors argue very earnestly that Krause stood in a position of a confidential advisor to the testator. The evidence of what happened subsequent to the execution of the will indicates a willingness on the part of Krause to assist Dr. Kelley. Being his confidential adviser, Krause did tell the testator that he should make a will and it seems he would have been derelict in his duty if he had done otherwise under the circumstances of this case. Krause was not a legatee under the will but Sullivan suggested very naturally that he should act as one of the executors of the will. While the trial court said there was no doubt a disposition on the part of Dr. Kelley to influence the testator, the testator gave no more to Kelley than he gave to the children of John Kelley, who was also a brother of his wife.

We are impressed with the fact that the objectors have failed to distinguish between influencing a testator by proper means and the exertion of undue influence upon a person who is incapable. A consideration of the whole evidence indicates that at least up to the time of the making of the will, the testator was his own man, made up his mind without outside help, and while open to reason, he only changed his mind for what appeared to him to be substantial and convincing reasons. Upon a careful consideration of the whole record, including the arguments and briefs of counsel on both sides, it is considered that the findings of the trial court as to the probate of the will are established not only by a preponderance of the evidence but by clear, convincing, and satisfactory evidence.

## The Codicil.

Sometime prior to July 30, 1945, Dr. Kelley wrote Krause. This letter has not been preserved. In reply, Krause wrote Kelley:

"I am very sure that everything was done to assist you in this matter. When you come down I will be glad to go over the entire matter again and do everything I can for your interest. But we must be careful so that the old gentleman will not destroy the will."

Apparently Dr. Kelley did not respond to this letter but without Krause's knowledge he visited the testator alone in Reedsburg on August 2, 1945. He disclosed his presence there to no one. On August 7, 1945, Dr. Kelley called on Mr. Sullivan again and had with him a completed codicil. He took the testator to the Reedsburg bank where the codicil was executed. Although Kelley wrote to Krause on the next day, August 3d, he made no mention of the fact that he had seen the testator alone on August 2d nor did he mention that he was preparing a codicil to the will which he intended to take back to Reedsburg and have Sullivan sign. When Kelley went to Reedsburg for the purpose of having the codicil executed, he did not go to see Krause nor did he at any time inform Krause of the execution of the codicil.

It will be remembered that by the terms of the will Krause and Dr. Kelley were named as executors of the will "under such proper bond as shall be fixed by the county court of Sauk county." By the terms of the codicil all of the estate of the testator was to be liquidated after the statutory four months' notice to creditors as soon as is practicable in the judgment of my sole executor, Dr. F. H. Kelley, of Merrill, Wisconsin.

It was further provided that Dr. Kelley should not be required to post any bond in any court of record of this state.

It is apparent that by this codicil prepared by Dr. Kelley those provisions of the testator's will to which he had attached

the greatest importance and which he insisted upon despite the suggestions to the contrary were entirely reversed by the codicil. The provision for his relatives after the payment of the specific legacies was that the remainder should be kept in trust so as to provide for the beneficiaries because he considered that they were not provident and would waste their legacies.

He nominated his long-time friend and trusted advisor Krause to be coexecutor of the trust with Dr. Kelley but provided that a bond should be given. This provision was changed by the codicil and Dr. Kelley became the sole executor without bond.

This sudden shift in the manner of disposing of his estate without any explanation thereof whatever raises a very strong suspicion that at the time the testator signed the codicil which had been prepared in Merrill without any consultation except such as was had on August 2d, he had been subject to undue influence.

The trial court found that at the time of the execution of said codicil,—

Daniel Sullivan was a person susceptible to undue influence, that F. H. Kelley was disposed to improperly influence the decedent and that such influence was in fact exercised; that the said codicil does not speak the desire or will of the testator, but that of F. H. Kelley, and should be avoided and denied validity.

Added to the character of the changes which were made by the execution of the codicil, the fact that it was procured by Dr. Kelley by means of sly, underhanded means, strongly supports the conclusion reached by the trial court.

In regard to the codicil the trial court said:

I have already found that there was opportunity for Dr. Kelley to exercise influence and effect a wrongful purpose and that there was a disposition to influence unduly for the purpose of procuring an improper favor.

He then said: With respect to the result clearly appearing to be the effect of the supposed influence, it must be obvious from a reading of the codicil that the terms of the codicil express loudly the effect of the influence.

"Within twenty days, Dr. Kelley would have us believe that the testator had so completely changed his attitude toward the will, toward his old business and social friend, Mr. Krause, whom he continued to use up to his death, and toward Dr. Kelley that:

"a. Mr. Krause was removed, and Dr. Kelley was substituted as sole executor, whose sole judgment should be taken in the liquidation of the estate.

"b. Whereas the county judge was to control the required bond under the will, the codicil ordered no bond.

"c. The trust fund for his own and nearest relatives in the amount of at least $50,000 was entirely eliminated.

"d. The interest of Dr. Kelley was increased from $5,000 in the will to approximately $20,000, without any evidence whatever of a change of attitude toward Dr. Kelley except the alleged note received from the testator, which Dr. Kelley could not produce at the trial.

"e. Provision for Dr. Kelley's son as a successor executor, when Dr. Kelley admitted this idea was his, not the testator's.

"I consider further comment on this point unnecessary. The foregoing evidence to me is conclusive."

The conclusion to be reached upon the evidence depends very largely upon the credibility of Dr. Kelley as he was the only witness who was present at the time when Dr. Kelley says that the testator asked him to prepare a codicil and who knows anything about what the testator wished to be included in the codicil.

Upon this phase of the case, the trial court said:

"The record reveals several subtle efforts to influence him. Dr. Kelley's letter stating that Judge Bohn pronounced the codicil legal states, in my opinion, a falsehood, and was doubtless intended to convey the impression that the codicil should express the testator's last testamentary wish. Judge Bohn was not subpœnaed, perhaps in deference to his office. However, knowing Judge Bohn as I do, I am convinced that he,

nor any other county judge in this state, is not violating the oath of his office by advising on the validity of wills or codicils at the time they are filed.

"I do not believe the testator ever wrote Dr. Kelley in August, 1945, to call on him, as Dr. Kelley testified. His explanation for his failure to produce the letter was unconvincing as was his demeanor while making the explanation. I am of the opinion that he took advantage of the information contained in the Krause letters by visiting the testator at the most propitious time, that he found the testator yielding, and that he made the most of the opening.

"The secrecy of the entire transaction, the failure to consult the testator's family attorney and trusted agent and friend, the announcement that the judge pronounced everything legal show the victim to be a credulous old man caught off guard, who without the services of his own attorney became easy prey to a cool, fast working, scheming and designing in-law." Citing *Will of Walker* (1927), 193 Wis. 264, 213 N. W. 626. See also *Estate of Scherrer* (1943), 242 Wis. 211, 7 N. W. (2d) 848.

The codicil was witnessed at the Reedsburg bank by the cashier and assistant cashier. The testimony of these witnesses is negative as to the competency of the testator except that he talked coherently and rationally.

It is considered that the determination of the trial court that the codicil should be denied probate should be affirmed.

*By the Court.*—Judgment affirmed.