WILL OF POLLER: GOODELL, Guardian *ad litem,* and another, Appellants, vs. POLLER, Proponent, Respondent.

*February 10—March 10, 1931.*

For the appellants there was a brief by *Kopp & Brunckhorst,* attorneys, and *R. A. Goodell,* guardian *ad litem,* all of Platteville, and oral argument by *Mr. L. A. Brunckhorst* and *Mr. Goodell.*

*D. J. Gardner* of Platteville, for the respondent.

OWEN, J. Henry Poller died on or about the 31st day of December, 1929, at the age of eighty-seven years. He left a last will and testament which was duly offered for probate. The admission of said will to probate was contested by the guardian *ad litem* and the general guardian of certain of his grandchildren. The will bequeathed $50 each to the five children of his deceased son, Archie Poller, and the remainder of his estate to his son, Samuel Poller. The county court admitted said will to probate, and the objectors appeal.

The evidence tends to show that for many years prior to his death the deceased lived on a farm owned by him in Grant county. His son Archie married about the time testator's wife died. Thereafter Archie and his wife lived with the deceased on the farm for a period of about nineteen years. During this time five children were born to Archie and his wife. The best of feeling always obtained between the deceased and his son Archie and his family. The deceased was very fond of Archie's children. There is no testimony that the least unpleasantness was ever experienced in the household.

Archie died July 17, 1927. After his death his widow Alvira and the deceased continued to live on the farm for about three months. About the 13th day of September a letter came to the farm addressed to the deceased. It was from a lawyer in Platteville. The deceased asked Alvira to read the letter to him. It spoke about a sale of the personal property on the farm, the expulsion of Alvira therefrom, and suggested that deceased could now look for a renter. This was the first time that Mrs. Poller had any suggestion that he contemplated putting her off the farm. She asked the deceased about it, and he said that he did not know anything about it. He made no reply to the letter, and on September 27th a similar letter came from the same lawyer.

Sam Poller, the deceased's other son, lived in Platteville. He and his family began importuning the deceased to come to town and live with them. They persuaded him that he should not longer live with Alvira and that he should board with some of the neighbors. He did so for a few days, but always returned to his farm house to sleep.

An auction sale was finally held, and the joint property of the deceased and Archie was sold. Sam and his family came out and got him and took him to their home in the city of Platteville.

When Alvira discovered that she was to be put off the farm she made a claim of $3,000 against the deceased for his support during the time that he had lived with her and her husband on the farm. This claim was adjusted, and the deceased paid her $2,000 on or about the 29th day of October, 1927. If the making of this claim and its settlement at the sum of $2,000 caused ill feeling on the part of the deceased, it does not appear to have been enduring, as the evidence introduced leaves the conviction that he always maintained a kindly attitude towards Alvira and entertained great fondness for her children.

The will offered for probate was dated October 19th, ten days before the settlement. This will was witnessed by three practicing physicians in Platteville. According to the testimony, the deceased went to the office of Dr. Dunn with a document which he proclaimed to Dr. Dunn was his will, and said to Dr. Dunn: "I want to get you to witness this and get somebody else to help you witness it. We have to have three witnesses. I want to make this will out to convey to my son Sam the property that I have. I have settled with Archie's wife, and I want Sam to get it all. I want this will to be prepared so that there will be no chance to interfere; because that Wienbergen (general guardian of the children) will get some crooked lawyer and attempt to break this will," and he asked, "What do you think I better

do?" to which Dr. Dunn replied he would get two other doctors to witness it, and Dr. Dunn thereupon called Dr. Buck and Dr. Pretts, and the three of them witnessed the will.

It was conceded by these doctors, or some of them, that it was an unusual thing for three doctors to gather and witness a will. It was sought to be shown that one of these doctors was paid for signing the will, by Sam Poller, but the court excluded that evidence. This was error. The proof of undue influence generally rests in circumstantial evidence. "Fraud travels incognito." Here was an unusual situation. The will was not signed in the lawyer's office where it was drawn. In fact the evidence does not show who drew the will. An old gentleman eighty-five years of age presents himself in a physician's office and wants to know what can be done to prevent "a crooked lawyer" from breaking his will. Three physicians are assembled to witness the will. Sam Poller was the principal beneficiary under the will. If these doctors or some of them had been paid by Sam Poller for their services in the matter, it had a very material bearing upon the question of whether Sam Poller engineered the execution of the will. The pursuit of this inquiry might have opened up an illuminating field. It should have been permitted.

There was evidence from many witnesses that the deceased always spoke kindly and affectionately of Archie's children, and frequently declared that he had made provision for them in his will. There is evidence to indicate that while he was living with his son Sam in Platteville from the time he left the farm down to the time of his death, Alvira and the children were living in Platteville also, but that Sam and his family protested against the deceased calling upon or visiting Archie's family. He did so upon a few occasions, but upon all such occasions he seemed ap-

prehensive lest Sam or his family find it out. At one time when the deceased was sick Archie's widow went to call upon him. She found him sitting in the rocking chair out in the yard. When Sam's wife and daughter discovered her she was ordered off the premises, and the chief of police was called to expel her therefrom. Many statements made by the deceased to others appear in the record, all of which indicate that Sam and his family, or some of them, were very imperious in the supervision of his movements; that he did not feel that he was privileged to do as he chose; that he feared to incur their displeasure, because of which he covertly visited Archie's widow and his grandchildren; that he had at all times retained the greatest affection for those grandchildren, and that he intended to make, and proclaimed that he had made, provision for them in his will.

We consider this evidence sufficient to constitute a *prima facie* case of undue influence, and to place upon Sam 'Poller the burden of meeting this evidence and showing his entire good faith in the premises. It is difficult to read this evidence and believe that deceased's conduct was not induced, if not directed, by some one. There is much ground to believe that he did not originate the idea of putting Archie's widow off from the farm. It seems difficult to believe that the solicitude which he manifested upon appearing in the physician's office with his will was purely impulsive. The county judge did not deem this evidence sufficient to put Sam Poller upon his proof to show what his connection with the making and execution of this will was. He admitted the will to probate without requiring any rebuttal on the part of the proponents. "Where a voluntary conveyance is made by an aged person of his entire property, without consideration, to one who stands in a position of trust and confidence to him, under circumstances of secrecy, the bur-

den of proof is upon the grantee to show that the conveyance was untainted with undue influence or fraud." *Doyle v. Welch,* 100 Wis. 24, 75 N. W. 400. The same principle applies to the beneficiaries under a will. *Estate of Weaver,* 191 Wis. 431, 211 N. W. 130.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings according to law.