WILL OF RAASCH: BOMKE and others, Appellants, vs. RAASCH, Respondent.

*February 7—March 7, 1939.*

550

552

For the appellants there was a brief by *Winter & Koehler* of Shawano, and oral argument by *P. J. Winter*.

For the respondent there was a brief by *Lehner & Lehner, Adolph P. Lehner,* and *O'Kelliher & Martineau,* all of Oconto Falls, and *James A. Martineau* of Oconto, and oral argument by *James A. Martineau.*

MARTIN, J. The trial court filed an exhaustive opinion in deciding the contest below, and, in view of the findings

quoted in the foregoing statement, we deem it proper to quote in part from that opinion:

"At the time the 1935 will was drawn, he [decedent] was about eighty-one years of age. He was a farmer, and owned sixty acres of land, had personal property consisting of mortgages, bank stock, and bank deposits worth at least $16,000.

"Until his death he lived on the farm. In March of 1933 all banks were closed; in the summer of 1934 the testator was driving a niece, Pauline Westphal, to Shawano after she had spent a week-end at the farm and was involved in an accident in which the niece was fatally injured. Pauline Westphal died on the 4th day of June, 1934, and on the 16th day of June, 1934, the testator's wife died. . . .

"Prior to 1933 his nephews, Henry Raasch and Arthur Raasch helped him with the farm work and his niece Pauline Westphal spent every other week-end there doing the cleaning, washing and baking. After the death of Pauline Westphal, Arthur Raasch continued to do the farm work and stayed there nights, taking the washing to his home to be done. . . .

"One group of witnesses testifies that until March, 1933, the testator was of a genial, happy disposition, and that his mind was clear and strong, almost stubborn, but that he began to change when the banks closed, and thereafter was gloomy and silent, and seemed to be thinking or brooding over the apparent losses he had sustained. That the death of Pauline Westphal in an accident which occurred while he was driving worried him a great deal, and he expressed an apprehension that he would 'have to pay,' and that the death of his wife was the final blow which made a changed man out of him. His condition grew steadily worse, and from that time until his death he is described as a gloomy, silent man, who assumed a stooping posture when sitting, with his head hanging down, apparently paying little attention to what went on around him, answering questions only with a 'yes' or 'no,' and often not answering at all. He became forgetful, often repeating what he had just said, and failing to recognize nieces and nephews and their husbands and wives, although he had known them for many years. He often began to relate something, and stopped suddenly, saying, 'I forget.'

"The other group was also well acquainted with the testator, but noticed little, if any, change in his mental processes. His conversation was rational, he played cards as well as usual, and his memory was good. None of them ever heard him complain about his memory, and he always recognized them and called them by name. Some of them testified that he was a large man, and had always been stooped as long as they remembered. The only change noticed was that he did not join in the conversation as readily as he did before his troubles. . . .

"The court observed the witnesses on the stand and we found it impossible to conclude that any of the witnesses were untruthful. The details supplied by them exclude the possibility that they were unobservant. The only remaining conclusion, therefore, is that the testator had spells when he was forgetful and did not recognize some of his nieces and nephews or their husbands or wives, but that at other times he was mentally alert. . . .

"It is, therefore, the finding of this court that although the testator may have had spells of forgetfulness, still at the time of the execution of the contested will, he was mentally competent to make it."

On the question as to the opportunity and disposition to exercise undue influence by the nephew, Walter Raasch, the court said:

"As to the opportunity to exercise undue influence, we unhesitatingly find that there was such opportunity. *Walter Raasch apparently acted as business agent for Martin Raasch for a number of years, associated with him a great deal and either transacted the testator's business alone or was with the testator when it was transacted.*

"We must also find that there was a disposition on the part of Walter Raasch to influence the testator unduly. This is shown, first, by the attempt of Walter Raasch in the presence of the scrivener to induce the testator to leave out of the 1934 will a provision for one of the nieces, *and, secondly, by the admissions on the part of Walter Raasch that he stripped the testator of his property before his death. The testator was possessed of personal property amounting to $16,000 or*

*$17,000, besides his homestead. All of this personal property was transferred to Walter Raasch during the testator's lifetime, although the testator by his will had provided for a number of other relatives. To our mind, this conclusively shows that Walter Raasch was disposed to use whatever means were at hand to acquire the testator's property."*

The court further said:

"Walter Raasch apparently occupied a position of trust and confidence with Martin Raasch."

The trial court's severe characterization of Walter Raasch's disposition to influence the testator unduly finds ample support in the evidence. Although Walter occupied a position of trust and confidence with testator and to a considerable extent assisted in the management of his business affairs, it is rather significant that he failed to testify as a witness for the proponent of the will as to testator's mental capacity. He was present in court, and was finally called adversely by the contestants, but even then he made no reference to the testator's mental capacity as of the time the will in question was made, or prior or subsequent to said time, although he admitted that sometime in the early part of 1937, he, in company with a disbarred attorney and another friend, went to the home of the testator and procured from him assignments of notes, mortgages, certificates of deposit, and other securities, and that, on the same occasion, he procured from the testator a deed of the homestead property in which his brother, Arthur, was named as the grantee. Of course, we cannot here deal with the assignments and conveyance obtained in the early part of 1937, but the transaction, on its face, is very persuasive as to Walter's disposition to use whatever means were at hand to acquire the testator's property. We cannot believe that the testator would ever intentionally pauperize himself. We find a trace of Walter's efforts to influence the testator back to the date the will in question was made. He

was with the testator on each occasion when a will was made, and, in the instant will, he tried to influence the testator with reference to a bequest to a certain niece.

Clearly, the trial court failed to apply the correct rule of law as to the burden of proof in view of the facts found and the uncontradicted evidence. The trial court having found the opportunity and the disposition, and that Walter occupied a position of trust and confidence with the testator, the burden rested with the proponent to show that the will was not tainted with undue influence. In *Davis v. Dean*, 66 Wis. 100, 26 N. W. 737, the action was brought for the rescission and cancellation of conveyances on the grounds that the grantor, when she executed the conveyances, was not of sound and disposing mind and memory; and if she was, that they were obtained by means of the fraud of the grantee, and the exercise by him of undue influence upon the grantor. At page 110 the court said:

"We do not say that fraud and undue influence were proved affirmatively, but only that the circumstances suggest them. If the burden of proof is upon the plaintiffs to show such fraud or undue influence, probably we could not disturb the findings of the circuit court which negative their existence. But under the circumstances of this case the burden of proof is not upon the plaintiffs. Because Mrs. Sparrowk stood *in loco parentis* to George, and their relations to each other were those of trust and confidence, and because of the suspicious circumstances under which the conveyances were made, and the injustice which will be inflicted upon the heirs of the grantor if the conveyances are held valid, *the law casts upon the grantee the burden of showing that the conveyances are untainted with undue influence or other fraud,* but were the intelligent and deliberate act of the grantor. This rule is to protect the weak and unsuspicious from the cunning and fraud of those who stand *in confidential relations to them,* and has its foundation in good morals and sound public policy. The grantee has failed to satisfy the requirements of the rule, and the presumption of injustice, fraud, and wrong stand against the conveyances, which he

must remove before the court is authorized to say that they are valid. This he has not done, and for that reason, also, his deeds must be canceled and held for naught."

See also *Quinn v. Quinn,* 130 Wis. 548, 551, 110 N. W. 488.

This same principle applies to the beneficiaries under a will. *Estate of Weaver,* 191 Wis. 431, 211 N. W. 130; *Will of Bocker,* 167 Wis. 100, 106, 166 N. W. 660; *Will of Stanley,* 226 Wis. 354, 359, 276 N. W. 353; *Will of Poller,* 204 Wis. 127, 131, 132, 235 N. W. 542.

The elements to be proved in order to establish the fact of undue influence are:

"(1) A person unquestionably subject to undue influence;

"(2) Opportunity to exercise such influence and effect the wrongful purpose;

"(3) A disposition to influence unduly for the purpose of procuring an improper favor; and

"(4) A result clearly appearing to be the effect of the supposed influence." *Will of Schaefer,* 207 Wis. 404, 411, 241 N. W. 382; *Will of Grosse,* 208 Wis. 473, 477, 243 N. W. 465; *Will of McLeish,* 209 Wis. 417, 422, 245 N. W. 197; *Will of Leisch,* 221 Wis. 641, 648, 267 N. W. 268; *Will of Stanley,* 226 Wis. 354, 356, 276 N. W. 353.

"Where three of the elements are established by clear and satisfactory evidence, slight additional evidence as to the fourth may compel the inference of its existence." *Will of Link,* 202 Wis. 1, 11, 231 N. W. 177; *Elliott v. Fisk,* 162 Wis. 249, 155 N. W. 110; *Will of Walker,* 193 Wis. 264, 213 N. W. 626; *Will of Leisch, supra; Will of Schaefer, supra; Will of McLeish, supra; Will of Stanley, supra.*

The attorney who drafted the will in question was one of the subscribing witnesses. He testified on behalf of the proponent, and, while he described the testator as being strong-minded and mentally capable of knowing what he was doing, he did say:

"I am not sure whether he had a thorough comprehension of his own property."

Again, he said:

"I couldn't say that he seemed to be forgetful."

Further he said:

"I don't think there was any undue influence exercised at the time."

Albert Weber, the other subscribing witness, happened to be at the attorney's office on that day to adjust some matters relative to a mortgage held by Martin Raasch. Walter Raasch was present. Mr. Weber testified that, in connection with the mortgage transaction, Walter had done the talking; that he had no conversation with Martin Raasch. He further testified:

"When they started talking of the will I was invited out. Martin Raasch stayed in the same room with Traeger and Walter Raasch. I was out about half hour or three-quarters of an hour before they called me in. Mr. Traeger called me in. Traeger made the statement that it was his will, that he had the will ready and said he would read it over. It was not read to Martin Raasch in my presence. Traeger asked me to sign as a witness. I was in the office altogether about an hour and a half. During all that time Martin Raasch didn't have any action. He was just sitting bent forward. Whenever we talked I talked with Walter Raasch. Walter Raasch done business for him. *I never saw Martin Raasch in that shape before. . . .* He didn't have anything to say whatsoever. . . . I know his wife was dead, one of them [Pauline Westphal] got killed in an accident, and he was naturally kind of worried that they were going to pick him up on that accident. *It seems from that time he was a changed man."*

It appears that Mr. Weber owed Martin Raasch $4,150 on a mortgage. Upon cross-examination, Mr. Weber testified:

"I talked with him [Martin Raasch] about money matters. He said I would have to see Walter. 'He knows all my business affairs.' *He [Martin Raasch] couldn't tell me anything or give me any satisfactory answer."*

All of the witnesses for the contestants, twelve in number, nearly all of whom had been acquainted with Martin Raasch for many years, testified as to having observed a changed condition in the testator, commencing with the bank failures in 1932–1933.  It appears that the testator had accumulated a substantial estate and had money on deposit in several banks.  Even after the bank failures, and at the time Walter procured the assignments in the forepart of 1937, to which we have made reference, the testator had an estate of at least $16,000 in addition to his homestead and the personal property located on the farm.  The amount of his financial losses due to bank failures does not appear.  Following the bank failures, and, on June 2, 1934, while he was driving his niece, Pauline Westphal, from the farm to the city of Shawano, his car become involved in an accident in which the niece was killed.  He apparently felt some responsibility in connection with this unfortunate accident.  Shortly thereafter his wife died.  All of the witnesses for contestants testified that these events caused a radical change in the testator, evidenced by marked forgetfulness, failure to know his nephews and nieces.  He became gloomy and downhearted and seemed to have lost interest in everything.  He seemed to be worrying a great deal, and could not carry on a connected conversation. Many of the witnesses testified that he was not competent to make a will.

We think the evidence clearly established the fact that following the events of 1933–1934, there was a decided change in the physical and mental condition of the testator.  It would indeed be difficult to read the testimony in this case and conclude otherwise.  There is no evidence to indicate that the nephews and nieces were not on equally friendly terms with their uncle, the testator.  It is true that some time prior to 1933, Henry and Arthur Raasch helped testator with the farm work.  There is no evidence that they were not paid

for the services rendered. - The nephew, Walter, married in 1924, and thereafter lived at Underhill, Mosling, or Pulaski, a distance of approximately twenty-five miles from the testator's farm. However, it does appear that during the year 1933 and thereafter he exercised almost complete control over the testator's business affairs down to the time he procured assignments of all of the testator's assets in 1937. Now, in view of the findings as to Walter's opportunity and disposition to influence the testator's disposition of his property, and, in view of the conceded fact that he occupied a position of trust and confidence with the testator, have we here a result clearly appearing to be the effect of the alleged influence? In that connection, it appears that the testator's total assets as of the time the will in question was made, aside from his homestead and the farm personal property, amounted to at least $16,000. The total bequests to all the nieces and nephews and to the testator's sister, provided she survived the testator, amounted to $4,980. Under the will Walter received a specific bequest of $1,200, and also received the residue of the estate, aside from the homestead and personal property, which would amount to $11,020. The evidence clearly establishes to our satisfaction, a result indicating the exercise of undue influence by Walter. Having a finding by the trial court as to Walter's opportunity to exercise undue influence with the testator, and a disposition to exercise such influence, coupled with a result clearly appearing to be the effect of such influence, only slight additional evidence may compel the inference of the existence of testator's susceptibility to undue influence. See *Will of Stanley, supra,* and cases cited. While we entertain some doubt as to the testator's mental capacity, and would hesitate to disturb the trial court's finding on that issue, we entertain no such doubt as to the issue of undue influence and the testator's susceptibility to such influence. We think the findings of the trial court

on that issue are against the great weight and clear preponderance of the evidence. We would have to so hold if the burden of proof rested upon the contestants, but it did not. When the contestants made their case and had established the relation of trust and confidence which Walter Raasch occupied with the testator, the burden of proof then shifted upon the proponent of the will. He has not met the burden cast upon him.

*By the Court.*—The order appealed from is reversed, and cause remanded with instructions to vacate said order and to deny the probate of the will.