ESTATE OF HAMM (Clayton) : HAMM (Irene) and others,
Appellants, v. JENKINS, Proponent, Respondent.

*No. 363.   Argued November 1, 1974.—Decided March 17, 1975.*
(Also reported in 227 N. W. 2d 34.)

280

Robert W. Hansen, Beilfuss, and Hanley, JJ., dissent.

For the appellants there were briefs by *Hoyt, Greene, Meissner & Walsh, S. C.,* attorneys, and *Hamilton T. Hoyt* of counsel, all of Milwaukee, and oral argument by *Hamilton T. Hoyt.*

For the respondent there was a brief by *Robert D. Jones* and *Louis R. Jones,* both of Milwaukee, and oral argument by *Robert D. Jones.*

Connor T. Hansen, J. Clayton P. Hamm, who had never married, died January 21, 1973, at the age of seventy-four. His surviving heirs and the appellants were his two sisters, Irene Hamm aged seventy-one years, and Phyllis Hamm aged sixty-eight years, who also were never married; a sister, Florence G. Stoker, aged seventy-two years, of Cleveland, Ohio; and three adult children of a deceased brother, Gilbert, and namely, Patricia Biever, Jeanne Eckels and Karen Rahn, all living outside the state and married.

In 1951, Clayton P. Hamm broke a hip and subsequently retired. July 19, 1954, Hamm suffered a stroke. The remainder of his life he required the services of a male attendant. Difficulty was experienced in securing such services from 1954 to 1965. In February, 1965, Jimmie Jenkins was employed as a male attendant for Hamm and he continued to serve in that capacity until Hamm died in 1973.

Between 1965 and 1970, Hamm executed four wills. The last will he executed was admitted to probate and is, therefore, the subject of this appeal. It was executed April 4, 1970. This will contained a $35,000 trust provision for his sister Irene, and a $50,000 bequest to his sister Phyllis. In the event of lapse, these bequests passed to the residuary legatees. The residue was divided 10 percent to his sister Florence G.; five percent to John T. Jenkins, Jimmie's brother who served as Hamm's attendant when Jimmie was not available; and 85 percent to Jimmie Jenkins. The will further provided that in the event Florence G. and her husband both predeceased the testator, her share was to go $9/10$ths to Jimmie Jenkins and $1/10$th to John T. Jenkins. In the event Jimmie Jenkins predeceased Hamm, or failed to meet certain conditions set forth in the will and not at issue on this appeal, his distributive share passed to his wife and children. At the time of the death of the testator his estate was valued at slightly in excess of $1,000,000 and consisted largely of securities.

The dispositive issue is whether the trial court's failure to find undue influence on the part of Jimmie Jenkins was contrary to the great weight and clear preponderance of the evidence.

The law governing the proof of undue influence and the scope of appellate review is well established. Undue influence must be proved by clear, satisfactory and convincing evidence and a finding by the trial court on the issue will not be upset on appeal unless it is against the great weight and clear preponderance of the evidence. *Estate of Von Ruden* (1972), 55 Wis. 2d 365, 373, 198 N. W. 2d 583; *Estate of Velk* (1972), 53 Wis. 2d 500, 192 N. W. 2d 844; *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93.

Therefore, on appeal we examine the record, not for facts to support a finding the trial court did not make or could have made, but for facts to support the finding the trial court did make.

Undue influence may be proved under either of two theories, both are advanced on this appeal. The first is founded upon the four elements of susceptibility, opportunity to influence, disposition to influence, and coveted result. *Will of Freitag* (1960), 9 Wis. 2d 315, 101 N. W. 2d 108; *Estate of Von Ruden, supra.* The second theory is based upon a confidential relationship between the testator and the beneficiary coupled with suspicious circumstances. *Will of Faulks* (1945), 246 Wis. 319, 17 N. W. 2d 423; *Will of Cooper, supra.*

In the instant case, the trial court found Jenkins had the opportunity to exert undue influence; that he had no disposition to unduly influence the testator; that Hamm was not susceptible to undue influence by Jenkins or any other person prior to and at the time he executed the will; and that the will did not reflect a coveted result by Jenkins or any other person. The trial court also found a confidential relationship existed between Jenkins and Hamm and that there were no suspicious circumstances surrounding or relating to the execution of the will.

We summarize the more relevant portions of the testimony, which we reviewed as a whole, to determine what is the great weight and clear preponderance of the evidence.

As a result of the stroke Hamm suffered in 1954, his right side was partially paralyzed and he, therefore, could not walk or write unassisted. His throat was also affected and his speech was impaired. The issue of competency is not raised. It appears that prior to 1963, he frequently drank alcoholic beverages to an excess; however, after 1963, his habits changed and this was no longer the situation.

The trial court found that he was alert and competent. His doctor testified that although Hamm was physically incapacitated, he was alert, intelligent and responsible

up until the last two weeks of his life when he was confined to the hospital for what proved to be his terminal illness. The account executive who handled his investment activity during the last eight or ten years of his life testified that Hamm was intelligent, had excellent business acumen and could not be influenced.

The record reflects that Hamm enjoyed good relations with his family. His brother, Gilbert, was an accountant and prepared Hamm's income tax returns until Gilbert died in 1960. From 1961, until the testator's death, lawyer Ralph J. Jeka prepared his income tax returns and performed legal services for him which consisted of real estate transactions and will drafting, with the exception of an occasion in 1965, which will be referred to hereinafter. Jeka saw Hamm on an average of six times per year.

For a number of years prior to 1953, Hamm and his sisters Irene and Phyllis lived together. Phyllis was financially self-sufficient and moved from the family home in 1953. She continued to visit him thereafter and partially took care of his needs. Irene remained in the home with Hamm, did the cooking and cleaning and managed the household on $100 per month supplied by Hamm. In the period from the time of Hamm's stroke in 1954 until 1965, at least 12 different male attendants were employed to care for him. All were discharged or left for various reasons.

In early 1965, Hamm was without an attendant and entered the Green Tree Nursing Home. While there he met Jimmie Jenkins, liked him and hired him as an attendant. Jenkins occupied this position until testator's death. In February, 1965, Jenkins accompanied Hamm from the Green Tree Nursing Home to Hamm's home. In September, 1965, Hamm entered the Pavilion Nursing Home. When this move took place Jenkins took over the writing and recording of the checks, a task formerly performed by Irene. Some of the checks were made out to

cash with Jenkins aiding Hamm's hand and Jenkins depositing the proceeds in his own account and writing checks to pay Hamm's expenses.

At the commencement of Jenkins' employment his net worth was meager. When Hamm died, Jenkins' net worth was $36,000, all attributable to funds received from the testator. Hamm's fondness for Jenkins and his dependency upon him continued to increase as the years passed. Among other things, Hamm enjoyed traveling and did so prior to his stroke in 1954. From 1954 to 1965, he did no traveling. With Jenkins as an attendant he was again able to resume traveling. At Hamm's expense, they traveled extensively, both abroad and in the United States. On occasion, the Jenkins family accompanied them. Jenkins cared for Hamm from 7 a. m. to 5 p. m. six days a week and had access to his Cadillac automobile. Jenkins' brother, John, cared for him on the seventh day.

There is no dispute about the fact that Jenkins was the best attendant Hamm ever had; that Hamm not only liked Jenkins, but was physically dependent upon him and apprehensive of losing his services. Hamm frequently visited the Jenkins family and occasionally the family of John Jenkins. It is practically undisputed that Hamm was a very frugal person and a shrewd businessman. Among other things, he constantly studied the Wall Street Journal and from the time he executed the first of his four wills in 1965, until his death in 1973, his assets approximately doubled in value, from $500,000 to over one million dollars.

The four wills he executed in his lifetime were dated February 15, 1965, August 24, 1965, July 8, 1966, and April 4, 1970, this latter one being the will admitted to probate.

The two 1965 wills were drafted by lawyer Irvin Charne. Irene Hamm testified that one Carl Elbinger was a client of Mr. Charne and recommended him. Neither

she nor the testator knew Mr. Charne. The record does not disclose whether Irene knew that Ralph J. Jeka had been Hamm's lawyer since 1961. The first of these wills was executed during Hamm's short stay at the Green Tree Nursing Home. The second was executed at his home and shortly before he entered the Pavilion Nursing Home. The testimony surrounding the execution of the second will is conflicting and we find it to be of no particular probative value. This will provided for a specific bequest to Jenkins in the amount of five percent of his estate. The conditions of this bequest required Jenkins to continue working for Hamm until Hamm's death unless unable to do so by no fault of his own.

The third will was executed July 8, 1966. This will was drafted by his lawyer, Ralph J. Jeka, who later also did legal work for Jenkins. This will established a $35,000 trust for Irene and bequeathed $50,000 to Phyllis and his automobile to Jenkins. The residue was divided as follows: 49 percent to Jenkins; two percent to John T. Jenkins; 10 percent to Florence G.; and 39 percent to Phyllis. The bequest to Jimmie was subject to the same qualifications as the prior will.

We now consider the facts and circumstances under which the last and fourth will was executed, it being the one admitted to probate.

This will was also drafted by lawyer Jeka. Hamm executed it on April 4, 1970, at the Pavilion Nursing Home. The testamentary provisions of this will have hereinbefore been set forth. Jenkins was with Hamm when the lawyer arrived at the nursing home. However, he left when requested to do so and was not present during the ensuing conversation between the lawyer and the testator or at the execution of the will.

The record discloses that during the will conference lawyer Jeka explained to Hamm that under the new will Jenkins' family would receive Jenkins' share of the

residue even though Jenkins did not meet the conditions of the will. He explained that this was a change from the previous wills. Lawyer Jeka did not specifically mention that the same result would obtain if Jenkins was fired for cause. We observe, however, that if Jenkins had been fired for cause, it would have been a simple matter for Hamm to write another will and thereby solve the problem.

There is evidence in the record that prior to 1970, Hamm contemplated a gift program favoring his sisters, Irene and Phyllis, but these plans were never consummated. There is also evidence that at one time Hamm intended Irene to have the family home, but the land was taken by eminent domain in 1966 and the proceeds became part of his estate.

The record also discloses that in 1966, Hamm purchased a house in Wauwatosa and leased it to Jenkins for $1,000 a year. A new lease was executed in 1968, reducing the rent to $70 per month with an option to purchase. This lease provided for termination by the lessee; however, there was no specific provision for termination by the lessor. In March, 1970, Hamm made a $30,000 gift to Jenkins. Part of these funds were used to purchase property on Elkhart Lake and a house on North 70th street in Milwaukee. Also, in 1970, Hamm purchased a $1,000 and a $5,000 certificate of deposit, naming himself and Jenkins as joint owners. These and other papers belonging to Hamm were kept by Jenkins. After Hamm's death, Jenkins had the certificates of deposit issued in his own name.

The record does not disclose that Hamm had a significant church relationship. Jenkins introduced Hamm to the pastor of his church, and, although it does not appear that Hamm ever attended church, on September 30, 1969, Hamm created a charitable remainder trust in the amount of $50,000. The Milwaukee Gospel Taber-

nacle was designated as beneficiary and Jenkins was named as trustee.

In considering the merits of this appeal, appellants assert that proof of undue influence may rest on circumstantial evidence. We find no dispute with this general statement of the law. This court has stated:

". . . [B]ecause acts of undue influence are usually done in secret, proof thereof must be based upon circumstantial evidence. *Estate of Phillips* (1961), 15 Wis. 2d 226, 231, 112 N. W. 2d 591. Obviously, if a beneficiary has either instructed the draftsman as to the contents of the will or has unduly influenced the testator as to the disposition of his property, he would not testify that he had done so." *Estate of Komarr* (1970), 46 Wis. 2d 230, 241, 175 N. W. 2d 473;

and

". . . circumstantial evidence is sufficient to prove undue influence . . . ." *Estate of Larsen* (1959), 7 Wis. 2d 263, 269, 96 N. W. 2d 489.

We first direct our attention to appellants' contention that undue influence has been adequately proved under the four classical elements of susceptibility, opportunity to influence, disposition to influence, and coveted result. *Estate of Von Ruden, supra.*

### *Susceptibility.*

The objectors must establish that the testator was susceptible of being influenced by the person charged with exercising undue influence. In its findings of fact, the trial court stated that Clayton P. Hamm was not susceptible to undue influence by Jimmie Jenkins or any other person prior to and at the time the will was executed.

While not determinative, the primary factors to be considered are testator's age, personality, physical and

mental health, and his ability to handle business affairs. *Estate of McGonigal* (1970), 46 Wis. 2d 205, 213, 174 N. W. 2d 256. Appellants point to Jenkins' success in obtaining financial favors from Hamm in spite of the latter's frugality; Hamm's fear of being left without a capable attendant; and Hamm's depression at about the time the will was signed in 1970. They also suggest that Hamm's deathbed agitation in 1973, when he desperately tried to tell his sisters something and repeated the word "bastard," indicates that Jenkins forced Hamm to do something against his will. Respondent counters with the considerable testimony of a doctor, nurse, investment counselor and others to the effect that Hamm had a strong-willed personality. In addition, there was testimony that Hamm's physical condition improved under the care of Jenkins and that Hamm read the Wall Street Journal up to the day before he died. With regard to the deathbed agitation, appellants were unable to prove that Hamm was referring to Jenkins.

Hamm's fear of losing the services of Jenkins provided motivation for the testamentary disposition, ". . . but all people are motivated by the influence of others." *Will of Cooper, supra,* page 400. The findings of the court on this issue are not against the great weight and clear preponderance of the evidence.

## Opportunity.

The trial court found that Jimmie Jenkins had opportunity to exert undue influence upon Hamm. It cannot be said that this finding is against the great weight and clear preponderance of the evidence.

## Disposition.

Proof of disposition to unduly influence a person who is susceptible requires more than demonstrating a desire

to obtain a share in the estate. ". . . It implies a willingness to do something wrong or unfair, and grasping or overreaching characteristics. . . ." *Estate of Brehmer* (1969), 41 Wis. 2d 349, 356, 164 N. W. 2d 318.

In the *Estate of McGonigal, supra,* page 214, it was stated:

". . . There is nothing wrong with aiding and comforting a failing testator; indeed, such activity should be encouraged. The fact that the testator is wealthy should have no effect on this encouragement."

This court evaluated the evidence pertaining to the element of disposition by focusing attention on the character and activities of the one charged with exercising undue influences in the *McGonigal Case, supra.* Guided by the evaluation of the evidence in *McGonigal,* we find that both Irene and Florence testified that Jenkins was pleasant to have around and that Hamm's family felt friendly toward him. To establish a grasping disposition on the part of Jenkins, appellants assert that he told Irene that he hoped " 'there is more in this job, more than peanuts for me;' " that he asked Hamm for a color TV set for his son; that he requested annual bonuses; that he told Hamm he wanted to be included in his will; and that Jenkins exhibited exuberant happiness at the funeral. Jenkins testified that he did not recall asking for a color TV and did not receive one from Hamm. Appellants also emphasize that, although Hamm did not like nursing homes, Jenkins arranged for him to enter the Pavilion and that Hamm's family did not know of the move until an hour before; that Jenkins always remained in the room when Hamm had visitors; that Hamm made a generous gift to Jenkins' church although Hamm had never been religious; and that a box containing Hamm's check records could not be found.

As was stated in *Estate of Von Ruden, supra,* at page 375, "[a]ll of the above circumstances, if unexplained,

might tend to establish a disposition . . . ." However, each of these circumstances can be at least partially explained. The Pavilion agreed to prepare special meals for Hamm and to allow him to continue his daily routine of going to the tavern. Jenkins considered it part of his job to remain at Hamm's side at all times; he left the room whenever he was requested to do so; and he was sometimes needed to interpret Hamm's speech which was difficult to understand. The pastor of the Milwaukee Gospel Tabernacle testified of paying eight professional visits to Hamm at the home and of Hamm's visits with the pastor in Hamm's automobile in front of the church. Additionally, Irene testified that her brother never attended church but was interested in leaving something to charity. Jenkins recalled seeing the box containing Hamm's canceled checks and check registers for the years after 1965 in the closet of the room at the Pavilion Nursing Home the Friday before he died. The day after the burial, Florence's husband and Jenkins packed up everything in the room. While in the process of doing this, they were notified that Phyllis had suffered a stroke and had to be taken to the hospital. They hurriedly finished packing and Jenkins later delivered everything to a lawyer.

While there is evidence favorable to appellants with regard to this element, the finding of the trial court that there was no disposition on the part of Jimmie Jenkins to unduly influence testator is not contrary to the evidence.

### Coveted result.

In considering the element of coveted result, this court has stated:

"A consideration of the element of a coveted result goes to the naturalness or expectedness of the bequest. Whether a will is unnatural, however, must be determined

from a consideration of all the surrounding circumstances. *Estate of Velk, supra,* page 511; *Estate of McGonigal, supra,* page 217. The mere fact that a testator has chosen to leave his property to close friends rather than to relatives does not necessarily render the disposition unnatural. *Estate of Steffke* (1970), 48 Wis. 2d 45, 49, 179 N. W. 2d 846." *Estate of Von Ruden, supra,* pages 375, 376.

The surrounding circumstances considered by this court in the *Will of Cooper, supra,* page 399; *Estate of McGonigal, supra,* page 217; *Estate of Von Ruden, supra,* page 376, and other cases have included the relationship between the testator and the beneficiary, the relationship between the testator and his relatives, whether the objectors were ever included in any previous will, whether the testator explained why he was excluding the objectors, the relative wealth of the parties and the unexpectedness of the testamentary provisions.

The relationship between Jenkins and Hamm was described as follows in the 1966 will, which was executed about five-and-one-half years prior to his death: "At the present I am employing JIMMIE JENKINS as a male nurse and attendant. I appreciate the services he is rendering to me and it is my hope and desire that he will continue to perform the services for me so long as I shall live." There is nothing in the record to indicate that Jenkins did not treat Hamm with anything but the best care and respect. The record also indicates that Hamm was on friendly terms with his relatives and held no animosity toward any of them. Here the objectors had been named beneficiaries of prior wills. The 1970 will eliminated the three nonresident, married nieces entirely and reduced the shares of Irene and Phyllis. With regard to this factor, this court has stated: ". . . while a change of beneficiary is of some significance, it is not controlling that the change was caused by undue influence." *Estate of Elvers* (1970), 48 Wis. 2d 17, 20, 179

N. W. 2d 881. Mr. Jeka testified that Hamm felt $50,000, free and clear of all death taxes, was sufficient for Phyllis and that, since Irene had an estate in her own right, the $35,000 trust would sufficiently take care of her. Irene testified that she had assets of about $100,000. The wealth of Phyllis, Florence and the nieces was not revealed in the record, but it is known that Phyllis was self-supporting and that Florence and the nieces were all married.

There is some dispute as to who knew how much about the will. Irene claimed Jenkins told her Hamm had changed his will but that she would not starve. Although lawyer Charne testified that in 1965, Jenkins was told Hamm wanted to leave something to him in his will, Jenkins denied knowing the contents of the will or that he was a beneficiary under it until after the funeral. John T. Jenkins stated that Hamm told him he was included in the will. This evidence is not adverse to the statements of the trial court that:

". . . the will does not reflect a coveted result of undue influence by Jimmie Jenkins or any other person in view of all the facts and circumstances relating to the preparation and execution of such will; and

". . . the bequest to Jimmie Jenkins was a reasonable and a natural one resulting from the kindness shown Clayton P. Hamm by Jimmie Jenkins and the affection developed by Clayton P. Hamm for Jimmie Jenkins and his family; . . ."

Appellants and respondent cite and summarize the facts of numerous cases dealing with undue influence. However, the issue in each case is primarily a factual one dependent upon the particular facts of the case:

"In undue influence determinations the emphasis is on the facts surrounding the situation. Legal precedent often is of little value. . . ." *Estate of McGonigal, supra,* at pages 217, 218.

The findings of fact made by the trial court in regard to the theory of undue influence above considered are not against the great weight and clear preponderance of the evidence.

These appellants also contend that undue influence was proved under the theory of confidential relationship between the testator and the beneficiary coupled with "suspicious circumstances." *Estate of Komarr* (1970), 46 Wis. 2d 230, 175 N. W. 2d 473.

In order to raise the presumption of undue influence under this theory and shift the burden of going forward with the evidence, two things must be established.

First, there must be a confidential relationship between the testator and the person who engaged in procuring the drafting of the will and takes a benefit thereunder. This relationship has been characterized as follows:

" '. . . The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting. . . . If one is not the actual draftsman or the procurer of the drafting, the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will. . . .' " *Estate of Velk* (1972), 53 Wis. 2d 500, 507, 192 N. W. 2d 844.

The trial court found that such relationship existed between testator and respondent, and the record supports such a finding.

Second, coupled with such a confidential relationship there must be "suspicious circumstances" surrounding the actual execution of the will. On this issue the trial court found: ". . . That there are no unusual or suspicious circumstances surrounding or relating to the execution of such will; . . ."

The basic question which must be determined from the evidence submitted is always whether "the free agency of

the testator has been destroyed." *Will of Faulks, supra,* page 359. From our review of the record, it cannot be said that this had occurred when the will was executed in April, 1970, or at any other time. We are of the opinion that appellants endeavor to invoke this theory of undue influence based upon a misconception of its elements. The concept of this presumption of undue influence is based upon the ease with which the confidant can dictate the contents of and control or influence the drafting of such will either as the draftsman or in procuring the drafting. *Estate of Steffke* (1970), 48 Wis. 2d 45, 51, 179 N. W. 2d 846.

It is almost uncontroverted that the testator was "alert," "competent," "intelligent," had "excellent business acumen" and "could not be influenced" up until the time he was hospitalized for his terminal illness two weeks before his death. The will admitted to probate was executed more than two-and-one-half years prior to his death. Jeka had done legal work and income tax work for Hamm for approximately four years before Hamm knew Jenkins. Jenkins did not know Jeka until after he started to work for Hamm.

There is no evidence in the record to reflect that Jenkins procured the drafting of the will or participated in its drafting. Nor is there evidence that Jenkins knew of the extent of his bequest until the will was published after the death of Hamm. The only possible evidence to support even an inference of such knowledge would be some opinion testimony of one of the sisters as to Jenkins' purported demeanor after the will was published.

While there is evidence that Jenkins and his brother knew they were beneficiaries, this knowledge alone does not create a suspicious circumstance.

Since Jenkins was not the draftsman of the will and the evidence would not support a finding that he was the procurer of the drafting, the relationship would have to be such that the testator depended upon the advice of

the confidant in relation to the subject matter of the will. While Hamm depended upon Jenkins for his physical needs, it does not follow that he depended upon or followed Jenkins' advice in personal financial matters. We find no evidence, direct or circumstantial, that Hamm sought or received any advice or assistance from Jenkins in his personal financial affairs. We are of the opinion that Hamm accumulated his estate without Jenkins' help or assistance and that he disposed of it as he saw fit and without his assistance.

*By the Court.*—Judgment affirmed.

ROBERT W. HANSEN, J. *(dissenting)*. The will of the aged and partially paralyzed testator, executed on April 4, 1970, devised 90 percent of the near-million-dollar estate to the testator's male nurse-attendant and his brother.[1] The will, admitted to probate by the trial court, is challenged on the ground of undue influence.

Ordinarily the test as to undue influence on a testator is fourfold: (1) Was there opportunity to influence? (2) Was there a disposition to influence? (3) Was there susceptibility to influence? and (4) Was a coveted result obtained?[2]

---

[1] The male nurse, Jimmie Jenkins, who had been employed for five years as personal attendant to the testator, Clayton P. Hamm, was bequeathed 85 percent of the residuary legacy, an increase from 49 percent in the previous will, executed on July 8, 1966. His brother, John Jenkins, was bequeathed five percent of the residuary legacy, an increase from the two percent provided in the 1966 will.

[2] *Estate of Von Ruden* (1972), 55 Wis. 2d 365, 373, 198 N. W. 2d 583, this court holding: "In order to void a will because of undue influence, four elements must be proved by clear, satisfactory and convincing evidence:

" '*Susceptibility*—a person who is susceptible of being unduly influenced by the person charged with exercising undue influence.

" '*Opportunity*—the opportunity of the person charged to exercise such influence on the susceptible person to procure the improper favor.

However, where the relationship between the testator and principal beneficiary is "confidential or fiduciary" in nature, that fact, "coupled with the existence of 'suspicious circumstances,' " is enough to create the presumption or inference of undue influence.[3]

The basis for the lowered requirement for successful challenge, where a confidential relationship exists, is "the ease in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting."[4] The "suspicious circumstances" test does not require establishing the confidant to be either draftsman or procurer.[5] If a confidential relationship is established, and if the circumstances are suspicious, the presumption or inference of undue influence arises.

" 'Disposition—a disposition on the part of the party charged to influence unduly such susceptible person for the purpose of procuring an improper favor either for himself or another.

" 'Coveted Result—a result caused by, or the effect of, such undue influence.' " (Quoting Will of Freitag (1960), 9 Wis. 2d 315, 317, 101 N. W. 2d 108.)

[3] Id. at page 373, this court holding: ". . . In addition, undue influence may be proved independently of the above criteria where a confidential or fiduciary relationship exists between the testator and the beneficiary coupled with the existence of 'suspicious circumstances.' " (Citing Estate of Komarr (1970), 46 Wis. 2d 230, 175 N. W. 2d 473; Will of Cooper (1965), 28 Wis. 2d 391, 137 N. W. 2d 93.)

[4] Estate of Steffke (1970), 48 Wis. 2d 45, 51, 179 N. W. 2d 846, this court holding: ". . . The basis for the undue influence presumption lies in the ease in which a confidant can dictate the contents and control or influence the drafting of such a will either as the draftsman or in procuring the drafting. . . ."

[5] Estate of Komarr (1970), 46 Wis. 2d 230, 241, 175 N. W. 2d 473, this court holding: ". . . Obviously, if a beneficiary has either instructed the draftsman as to the contents of the will or has unduly influenced the testator as to the disposition of his property, he would not testify that he had done so." (Emphasis supplied.)

As to whether the fourfold test or the single "suspicious circumstances" test, either an independent alternative,[6] here applies, the question must be asked and answered as to whether there was here a "confidential relationship" at the time the challenged will was executed.

*Q. Relationship confidential?*

*A.* Yes.

While our court has found confidential relationships to exist in a broad variety of situations,[7] it has distinguished between relations involving social matters and those involving matters of personal finances.[8] In the case before us, the relationship ripened and expanded to be-

[6] *Id.* at page 239, this court holding: "However, in *Will of Cooper* (1965), 28 Wis. 2d 391, 395, 137 N. W. 2d 93, Mr. Chief Justice HALLOWS, citing *Will of Faulks, supra* [(1945), 246 Wis. 319, 17 N. W. 2d 423] also recognized 'the confidential relationship between the testator and the beneficiary coupled with "suspicious circumstances," ' as an independent theory or method of proving undue influence."

[7] Confidential relationship between testator and beneficiary held to exist in: *Will of Cooper* (1965), 28 Wis. 2d 391, 137 N. W. 2d 93, as to unrelated friend who cared for and handled business affairs of competent man suffering from leukemia; *Will of Faulks* (1945), 246 Wis. 319, 17 N. W. 2d 423, as to confidential business advisor; *Will of Raasch* (1939), 230 Wis. 548, 284 N. W. 571, as to distant relative serving as business advisor to eighty-one-year-old who was losing mental capacities; *Estate of Weaver* (1926), 191 Wis. 431, 211 N. W. 130, as to son who was business advisor to enfeebled father; *Winn v. Itzel* (1905), 125 Wis. 19, 103 N. W. 220, as to unrelated companion who cared for physically enfeebled but mentally competent testator, aged eighty-two; *Cole v. Getzinger* (1897), 96 Wis. 559, 71 N. W. 75, as to relatives caring for incompetent. *See also: Vance v. Davis* (1903), 118 Wis. 548, 95 N. W. 939.

[8] *Estate of Steffke, supra,* footnote 4, at page 51, this court holding: ". . . the relationship must be such that the testator depends upon the advice of the confidant in relation to the subject matter of the will. A person may very well depend upon the judgment of another in social matters or in art or in science, but would not follow his advice in personal financial affairs. . . ."

come confidential and fiduciary as to personal financial affairs. The male nurse, Jimmie Jenkins, testified that the testator purchased two certificates of deposit, made out jointly to himself and Jenkins, which Jenkins kept in a metal box in the Jenkins home for safekeeping. Jenkins testified to the testator making out checks to "Cash," with Jenkins depositing the checks in his bank account and writing checks on his account to persons and in amounts designated by the testator. Jenkins testified that, in addition to receiving a gift of $30,000 from testator in 1970, he was the trustee of a $50,000 charitable remainder trust created by testator for the benefit of Jenkins' church which testator had never entered. The lawyer who drew the will testified that Jenkins submitted to him the information required to make out the testator's income tax returns. The relationship was clearly confidential and did relate to the income and property of the testator. The trial court so held.

*Q. Proper test used?*
*A.* No.

After concluding that a confidential relationship did exist between this testator and this principal beneficiary, the trial judge then proceeded to apply the four-pronged test of opportunity—disposition—susceptibility—coveted result. The trial court conclusion of law was that this will survived such fourfold requirement for successful challenge. This was error. Having found that a confidential relationship here existed when this will was executed, the trial court was required and entitled only to determine whether the circumstances surrounding the execution of the challenged will were suspicious. It is the lesser requirement for successful challenge that was here available to the challengers. In its formal judgment, the trial court included as a finding of fact: "(d) That there are no unusual or suspicious circumstances sur-

rounding or relating to the execution of such will." However, the trial court opinion deals only with the fourfold test and makes no reference to the presence or absence of suspicious circumstances. No facts are mentioned in the opinion or stated in the judgment to support the paragraph (d) finding. In this situation the single sentence statement as to suspicious circumstances becomes a conclusion of law, no more.[9] Since the facts to support the conclusion do not appear in the judgment and are not mentioned in the opinion, the issue on appeal becomes whether there are facts in this record to warrant the holding that suspicious circumstances were not present at the time of execution of the challenged will.

*Q. Circumstances suspicious?*
*A.* Yes.

In determining whether the surrounding circumstances here are suspicious, we are to consider "the facts surrounding the situation," [10] and "scrutinize the evidence more closely and weigh it more carefully than . . . in other cases." [11] Additionally, we are to keep in mind

---

[9] *Tesch v. Industrial Comm.* (1930), 200 Wis. 616, 621, 622, 229 N. W. 194, this court holding: ". . . where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law and is not a finding of fact. Consequently, when, as in this case, the commission says, 'that on said day said Emil Brustman was employed by said Edwin Tesch,' it merely announces its decision. . . . the facts to which the commission applied the rule of law do not appear in the findings. . . ." (Cited, followed and applied to probate proceedings in *Estate of Curtis* (1948), 253 Wis. 119, 125, 33 N. W. 2d 193, 33 N. W. 2d 864.)

[10] *Estate of McGonigal* (1970), 46 Wis. 2d 205, 217, 218, 174 N. W. 2d 256, this court holding: "In undue influence determinations the emphasis is on the facts surrounding the situation. Legal precedent often is of little value. . . ."

[11] *Estate of Komarr, supra,* footnote 5, at page 240, this court holding: "As early as *Will of Faulks, supra* [see footnote 6] this court noted the existence of a fiduciary relationship would cause courts to scrutinize the evidence more closely and weigh it more carefully than it does in other cases. . . ."

that "because acts of undue influence are usually done in secret, proof thereof must be based upon circumstantial evidence." [12] This medicine was prescribed by this court for trial courts, but we take it here, relying, however, only upon facts in this record that are not at all in dispute.

We deal here with a sequence of wills. The first was executed in 1965 by the testator when he was a patient in a nursing home and was witnessed by Jimmie Jenkins, then an attendant in the nursing home. Five months later, the attorney who drafted that will, Irvin Charne, was told by the testator to draft a codicil giving Jenkins $5,000. Attorney Charne testified he was informed by the testator one week later that Jenkins was dissatisfied with a $5,000 bequest, and the will was revised to give Jenkins five percent of testator's estate. One year later, in 1966, a different lawyer, Ralph Jeka, who had prepared tax returns for the testator and had been Jenkins' lawyer, prepared a new will, giving 49 percent of the residue to Jenkins. In 1970, when the testator was again in a nursing home, the will here being challenged was drafted by Attorney Jeka and signed by the testator, giving 85 percent of the residue, or approximately $800,000, to Jenkins, and five percent, or about $40,000, to his brother, John.

The suspicion-creating circumstances in the 1970 will are the elimination of the heirs at law of the testator as

---

[12] *Id.* at pages 240, 241, this court holding: "In refusing to find Attorney Beaudry's conduct suspicious, the trial court noted he had not personally drafted the instrument and was not present at its execution. . . . the trial court's decision stated, '. . . There is no evidence to show that [Mr. Beaudry] instructed Mr. Balistreri on how to draft this document. . . .'

"The above statement is indicative of a failure to sufficiently consider this court's repeated pronouncement that because acts of undue influence are usually done in secret, proof thereof must be based upon circumstantial evidence." (Citing *Estate of Phillips* (1961), 15 Wis. 2d 226, 231, 112 N. W. 2d 591.)

legatees in case of lapse of any specific bequest or residuary legacy, and the substitution of the wife and children of Jimmie Jenkins as such legatees in case of lapse of any specific bequest or residuary legacy. The heirs at law of the testator are his three sisters, Florence, Phyllis and Irene, and his three nieces, Patricia, Jeanne and Karen, children of his deceased brother, Gilbert. This provision eliminating the heirs at law and substituting the family of the male nurse is a change from the previous wills.

The elimination of the heirs at law and substitution of the wife and children of Jimmie Jenkins as legatees in case of lapse, takes on greater significance because the 85 percent residuary bequest to Jenkins is conditional upon his remaining in the employment of the testator. Lapse under this will is not merely the usual reference to a legatee predeceasing the testator. Instead, lapse of the 85 percent legacy to Jenkins here occurs if the male nurse quits his job or is discharged for cause prior to the death of the testator. In both the 1966 and 1970 wills, this condition as to Jenkins not quitting his job or being fired is stated as follows:

"If, *at the time of my death* or recently prior thereto, Jimmie Jenkins *has been working for me* and rendering such services to me on a substantially full time basis, *or* if, at such time he has been ready, willing and able to work for me and render such services and has been prevented from performing them only by reason of either my hospitalization or other confinement in a place where he is not permitted to perform the services for me, *or* the fact that he was *discharged for some reason other than his misconduct or failure to properly perform* such services for me by a guardian or person in charge of my affairs in the event I become incompetent, *then and in that event,* I bequeath to him eighty-five percent (85%) [*Note:* 49 percent in the 1966 will] of my residuary estate. . . ." (Emphasis supplied.)

In the 1966 will, the next sentence reads:

*"In the event* the said Jimmie Jenkins predeceases me, *or fails to qualify under the provisions above set forth,* then and in that event I give and bequeath such forty-nine percent (49%) of my residuary estate *to those persons who are my heirs at law."* (Emphasis supplied.)

In the 1970 will, this provision as to the consequences of Jimmie Jenkins' predeceasing the testator or quitting or being discharged for cause from his employment is changed to provide:

*"In the event* the said Jimmie Jenkins predeceases me, or *fails to qualify* under the provisions above set forth, then and in that event I give, bequeath and devise such eighty-five percent (85%) of my residuary estate *to his wife and children* who survive me, share and share alike." (Emphasis supplied.)

That the 85 percent residuary legacy to the male nurse was conditioned upon his remaining in the employment of the testator is clear. If he quit or was discharged for cause he got nothing under either the 1966 or the 1970 will. The significance of the change in the 1970 will as to who would receive the 85 percent legacy if Jimmie Jenkins quit or was fired is evident. Our court has held that a suspicious circumstance as to undue influence is "any sudden and unexplained change in the attitude of the testator." [13] Was the elimination of the three sisters and three nieces of the testator in the 1970 will such an "unexplained change in the attitude of the testator?" Our court held, where a will eliminated most of the

---

[13] *Estate of Komarr, supra,* footnote 5, at pages 239, 240, this court holding: "In the instant case the trial court, also citing *Faulks, supra* [*see,* footnote 6] at page 360, correctly states that the existence of a confidential relationship between the testatrix and the favored beneficiary does not of itself constitute undue influence but when coupled with suspicious circumstances may give rise to an inference thereof. In *Faulks* this court indicated such circumstances, although not exhaustive, included . . . any sudden and unexplained change in the attitude of the testator."

testatrix's brothers, sisters, nieces and nephews and made the late-in-life companion of the eighty-four-year-old testatrix the residuary legatee, that "the transfer of the residue to Mrs. Hydanus [the late-in-life companion] was a remarkable and unnatural bequest which raised a red flag of warning." [14] Was the substitution here of the wife and children of the male nurse as legatees in the event that the male nurse lost his conditional legacy by quitting or being fired such an "unnatural bequest which raised a red flag of warning?" Our court has held that there may be "some other somewhat persuasive circumstance" which gives rise to an inference of undue influence. [15] One such circumstance is where the "will itself reflects a result which might be attributable to undue influence." [16] Is the substitution of the family of the male nurse for the heirs at law of the testator as legatees

---

[14] *Estate of Culver* (1964), 22 Wis. 2d 665, 672, 673, 126 N. W. 2d 536, affirming trial court finding that the will was executed under delusions that relatives and husband did not care for her, this court holding as to suspiciousness of the circumstances: ". . . Although Mrs. Culver left four brothers and three sisters who survived her, as well as a large number of nephews and nieces, the provisions of the will cut off all but a very few of her relatives with one dollar. The estate was approximately $30,000, yet no blood relative received more than $300. There were two charitable bequests of $1,000 each, but it is undeniable that the transfer of. the residue to Mrs. Hydanus was a remarkable and unnatural bequest which raised a red flag of warning."

[15] *Will of Faulks, supra,* footnote 6, at page 360, this court holding that, where there is a confidential relation between a testator and the beneficiary under his will, the rule is: ". . . When coupled with other circumstances such as . . . a sudden and unexplained change in the attitude of the testator or some other somewhat persuasive circumstance, it gives rise to an inference of undue influence which the proponent has the burden of rebutting. . . ."

[16] *Estate of Culver, supra,* footnote 14, at page 672, this court stating: "It is obvious that the proposed will itself reflects a result which might be attributable to undue influence. . . ."

in case of lapse such a "persuasive circumstance" by reason of its being inconsistent with the stated purpose of the conditional bequest to the male nurse and personal attendant of the testator? We would answer all three questions affirmatively.

*Q. Change of attitude unexplained?*
*A.* Yes.

The elimination in the 1970 will of the heirs at law of the testator and the substitution of the family of the male nurse as legatees in case of lapse is a sudden and unexplained change of attitude on the part of the testator. Under the 1966 will, and the earlier wills, the three sisters of the testator and the three children of his deceased brother were the legatees in case of lapse of either specific bequests or residual legacies. Under the 1970 will, the two unmarried sisters receive specific bequests, and the residuary legacy of one, the one who suffered a stroke, is reduced from 39 percent to zero. All three sisters and all three nieces are dropped as legatees in case of lapse.

There is nothing in this record to suggest, much less sustain, any inference that the relationship of this testator to his three sisters and to the three children of his deceased brother was anything except one of friendship and shared goodwill. No claim that it was anything less than that is made. This close and cordial and concerned brother-sisters and uncle-nieces relationship continued up until the time of death of the testator. In 1965, the testator told his then attorney, Irvin Charne, that he wished particularly to benefit his two unmarried sisters who lived in Milwaukee; that they had been very helpful to him and had borne the responsibility of taking care of him; and that he was concerned for their future if something happened to him. The married sister, who had moved to Cleveland, came to Milwaukee at least

three times a year to visit her brother, and always spent Christmas with him and her sisters. It is not disputed that the testator had a great love and affection for his three nieces as they grew up, that he saw his nieces once or twice a week until their respective marriages, and there is no indication in this record that he did not continue to think kindly and wish well the three children of his deceased brother. This is not a situation in which a testator in his will "explained why he was excluding his sister and nieces and nephews at the time of execution." [17] Under the test in *Komarr*, we have here, in the elimination of the heirs at law and substitution of the family of the male nurse as legatees in case of lapse, a ". . . sudden and unexplained change in the attitude of the testator." [18]

*Q. Unnatural result reached?*
*A.* Yes.

The substitution of the family of the male nurse for the heirs at law of the testator as to lapsed legacies is an unnatural bequest and produces an unnatural result. The dramatic change in the 1970 will was the escalating of the share of the male nurse and his brother to nine-tenths of the residuary legacy, which in turn was nine-tenths of the million-dollar estate. The male nurse's share was increased from 49 percent to 85 percent, or about $800,000. The brother's share was increased from two percent to five percent, or about $40,000. [19] A reason-

---

[17] *Estate of Von Ruden, supra,* footnote 2, at page 376, this court stating: "In the instant case . . . [t]he court based its conclusion on the relationship between Sagmoen and the testator and the fact that the testator had explained why he was excluding his sister and nieces and nephews at the time of execution. . . ."

[18] *Estate of Komarr, supra,* footnote 5, at page 240.

[19] *Note:* The brother, John Jenkins, testified that he filled in for his brother, Jimmie, on Jimmie's days off. Brother John testified that he received no salary or pay from the testator for

able person might find something suspicious as to undue influence in this escalation of the amounts devised to the two brothers. However, we put the focus on the naming of the male nurse's family, instead of testator's heirs at law, as legatees in case of lapse. Asked whether he had explained to the testator that there "was a change from the previous will, that in the event Jimmie Jenkins did not qualify under the 1970 will, instead of 85 percent going to Mr. Hamm's heirs it would now go to Mr. Jenkins' wife and children," the attorney who drafted the will, Ralph Jeka, testified: "Yes. This was discussed in the preliminary conference at the nursing home, but prior to the date on which the will of 1970 was signed." That discussion at that conference at the nursing home is not helpful either on the issue of prior undue influence or as to any reason for an unnatural result reached.

In the *Estate of Culver Case*,[20] this court dealt with the exclusion of sisters and brothers and nieces and nephews from the will of an aged testatrix, suffering from arteriosclerosis, by the naming of a late-in-life companion as the residuary legatee. As to the suspiciousness of such transfer of the residue, this court found the transfer to be ". . . a remarkable and unnatural bequest which raised a red flag of warning."[21] That was

the backup service provided during the two years prior to execution of the 1970 will, only reimbursement for gas and meals. John testified that he was a factory worker with no training as nurse or attendant. The serving as a substitute on occasion appears primarily to have been an accommodation to the brother, Jimmie, analogous to a regular baby-sitter who arranges for a brother or sister to fill in on an evening when the regular sitter is otherwise engaged. Providing such sibling replacement eliminates the possibility for such baby-sitter than an outsider hired as a temporary substitute might become the regular provider of the service involved. Even temporary access to the employer by one who might take over the regular job is thus limited.

[20] *Estate of Culver, supra,* footnote 14.

[21] *Id.* at 673.

a $30,000 estate. This is a million-dollar estate. Here three sisters and three nieces are eliminated as takers in the event of lapse in favor of the wife and children of an attendant, employed late-in-life by the testator. On this record, the three sisters and the three nieces are natural objects of the testator's concern and bounty. For many years these next of kin had been linked to him by ties of blood and companionship. Nieces and sisters were unusually solicitous of him, before and after he sustained his stroke, and his sisters had cared for him when he became almost helpless by reason of the stroke.[22] The provision in the 1970 will naming the wife and children of the male nurse as legatees in case of lapse in place of the three sisters and three nieces is here an unnatural bequest which, indeed, does "[raise] a red flag of warning."

*Q. Inconsistent with stated purpose?*
*A. Yes.*

The naming in the 1970 will of the wife and children of Jimmie Jenkins in case of lapse of the three-quarters-of-a-million dollar conditional bequest to Jimmie Jenkins is completely inconsistent with the stated purpose of such major bequest to such favored beneficiary. Of and by itself, such irreconcilability of change made and purpose stated in the 1970 will is completely persuasive of the fact of undue influence upon the testator.

It is perfectly clear that the bequest to Jenkins was entirely conditioned upon his remaining in the employ of the testator until the time of testator's death. If Jenkins earlier quit or was discharged for misconduct or failure to perform, he got nothing. The reason for the bequest, and its conditional nature, is stated in the will

---

[22] *Id.* at page 673, this court holding: "The trial judge's conclusions that Mrs. Culver's family was normally solicitous of her and cared for her when she was sick are also warranted. . . ." (Citing *Will of Riemer* (1957), 2 Wis. 2d 16, 85 N. W. 2d 804.)

as follows: ". . . At the present time I am employing Jimmie Jenkins as a male nurse and attendant. I appreciate the services he is rendering to me and it is my hope and desire that he will continue to perform the services for me so long as I shall live." Putting aside the enfeeblement and complete physical dependency of the testator that led him to pay so high a price for Jenkins staying in his employment, it is clear that the condition of remaining in employment makes the major consideration not appreciation, but the hope and desire of the testator to have Jenkins "continue to perform the services for me so long as I shall live." The predominating consideration for retaining Jenkins' services is thus made evident.

Under the 1966 will, if Jenkins quit or was discharged by the testator, the bequest to Jenkins lapsed and went to the testator's three sisters and the children of his deceased brother as the heirs at law. Neither Jenkins nor his family got anything under the will in such event. Under the 1970 will, if Jenkins quit or was fired, the three-quarter million dollar or so bequest to him lapsed, but now his family gets what he lost. For the 1970 will provides that:

". . . *In the event* the said *Jimmie Jenkins* predeceases me, *or fails to qualify under the provisions above set forth,* then and in that event I give, bequeath and *devise such eighty-five percent (85%)* of my residuary estate *to his wife and children* who survive me, share and share alike." (Emphasis supplied.)

The persuasiveness of this change in the consequences of Jenkins' quitting or being discharged from his job as it relates to suspicion of undue influence is that the result reached is completely inconsistent with the evident purpose of the conditional bequest to Jenkins as stated in the will. The result goes beyond arousing suspicion to making it impossible to believe that the will of 1970,

as to this change made, represents "the free agency of the testator." [23]

Here is a testator who, in 1966, bequeathed nearly half his estate to his male nurse, but with the condition that, if such male nurse quit his employment or was discharged for cause before the death of the testator, he was to get nothing at all under the will. Attaching such consequence of getting nothing if he left the employ of the testator added whip to carrot to the incentive to remain on the job. A half of a substantial estate if you stay on the job—nothing if you leave or get discharged for misconduct or failure to perform the duties involved. The testator's statement of intent that it was his hope and desire to have Jimmie Jenkins remain in his employment is clearly expressed, and as clear is the desperate need of the aged paralytic not to lose the substitute arms and legs upon which he had come to depend.

Under the 1970 will, the ante goes up and the male nurse is to receive over three-quarters of a million dollars if he does not leave the partially paralyzed old man. But now, under the 1970 will, if the male nurse does quit or leave the employment, no longer do the heirs at law of the testator become substituted as the legatees in case of lapse. Now the ones who get the lapsed legacy become the wife and children of the beneficiary who caused the lapse by quitting or leaving the employment. If Jenkins had quit or been discharged the day after the 1970 will was signed, the three-quarters of a million

---

[23] *Will of Faulks, supra,* footnote 6, at pages 358, 359, this court holding: ". . . It is generally held that the existence of confidential relations between the testator and the favored beneficiary, standing alone, do not necessarily constitute undue influence although it may cause the court to examine the case with greater scrutiny and may, when coupled with other circumstances, raise a presumption of undue influence, but the question must be determined, as in all other cases, by ascertaining whether the free agency of the testator has been destroyed. . . ."

dollars would have gone, not to the heirs at law as under the 1966 will, but to his wife and his children. Can it be seriously contended that a testator, not under undue influence, would thus increase the size of the carrot to keep the beneficiary in his employment—and throw away the stick of adverse consequences of his electing to leave such employment? The increase in the size of the bequest could be explained as an additional favorable consequence of the male nurse staying with his employer. The change in beneficiary in case of lapse cannot be so explained. For, under the 1970 will, the only consequence of the male nurse leaving the job would be that his family, not he, himself, would get the 85 percent bequest. This change of beneficiary in case of lapse of the conditional bequest is completely inconsistent with and destructive of the stated intent and purpose of the testator in making the bequest and in making it conditional.

It does not stand to reason that this testator would, of his own free will, increase the reward for a male nurse-attendant remaining in his employment to over three-quarters of a million dollars in the 1970 will, and then provide that, if such employee left his service, he would receive nothing under the will, but that his wife and children would receive the lapsed legacy instead of testator's heirs at law. There is no suggestion in this record that this testator ever stated any desire or reason for adding a provision in case of lapse so entirely inconsistent with the stated purpose and expressed condition of the bequest to the male nurse who had been for five years his personal attendant. The closest to it comes in this question asked and this answer given by the attorney who drafted the 1970 will:

"Q. And did you give Mr. Hamm any example of what might happen, for instance, if Jimmie Jenkins were discharged for cause, if he had done something wrong and Mr. Hamm had discharged him, that in that event

the 85% would still go to Jimmie Jenkins' wife and children? Did you talk that over with Mr. Hamm?

"*A.* I don't believe that that point was that fully discussed."

But that would suggest that the aged and half-paralyzed testator, unable to speak clearly and communicate effectively, was not even informed and did not even comprehend the consequences of the wife and family of his employee being named as legatees in case of lapse in place and stead of his heirs at law. We deal here with undue influence upon the testator, not with his competency. We find the provision in the 1970 will that the wife and children of Jimmie Jenkins would get the major share of this estate if Jimmie Jenkins were to lose such bequest by quitting or by being discharged, in itself to be a suspicion-establishing circumstance.

*Q. Influence undue?*
*A.* Yes.

The writer, on behalf of himself, Mr. Justice BRUCE F. BEILFUSS and Mr. Justice LEO B. HANLEY joining in this dissent, would hold: (1) That the relationship between this testator and Jimmie Jenkins, at the time of the execution of the challenged will, was confidential in nature; and (2) that the circumstances surrounding the execution of this will of 1970 were suspicious. It follows that the challengers to the admission of the 1970 will to probate met their standard of proof under the "confidential relationship, coupled with suspicious circumstances" test. Here that test was clearly the one applicable. With the presumption or inference of undue influence thus established, and nowhere in this record negatived, it likewise follows that the trial court erred in admitting the will of April 4, 1970, to probate. We would reverse the judgment, and remand the case for

further proceedings, directing that the 1970 will be refused admission to probate on the ground of undue influence. We would not reach or rule on the admissibility of the will of July 8, 1966, awarding 49 percent of the residual estate to the male nurse, but note that the suspicious circumstance we would find here established appears related solely to the will of April 4, 1970, awarding 85 percent of the residue to the nurse-attendant.

I am authorized to state that Mr. Justice BRUCE F. BEILFUSS and Mr. Justice LEO B. HANLEY join in this dissent.